[No. 6731–5–II.   Division Two.   February 15, 1985.]

THE STATE OF WASHINGTON, *Respondent*, v. NELSON LEE SELLERS, *Appellant*.

*Monte E. Hester,* for appellant (appointed counsel for appeal).

*William H. Griffies, Prosecuting Attorney,* and *Barbara L. Corey–Boulet, Deputy,* for respondent.

WORSWICK, C.J.—On August 6, 1982, two witnesses saw a man shoot a woman. No body was ever found, but authorities had reason to believe the victim was Pamela Sellers. Nelson Lee Sellers, her husband, was convicted of second degree murder. He raises seven claims of error on this appeal. We affirm.

The shooting took place between 9:30 and 10 a.m. on the street in front of Sellers' mother's house. The witnesses reported that the gunman put the victim into her car and drove away. When police arrived, they found Sellers' 8–year–old son, Nelson, Jr., wandering among the cars parked along the street. He told them he had not seen anything. Detective Michael Lynch took the boy with him while he continued his investigation. They then returned to the station to wait for personnel from Children's Protective

Services. Lynch testified that, while they were in his office, Nelson, Jr., began to talk about the incident. He told Lynch he heard his parents arguing in the street. His father said he was going to shoot his mother. There were gunshots. He went outside, found his mother lying in the street, kissed her, and ran back into the house. When he went outside again, his parents and his mother's car were gone.

Nelson, Jr., did not so testify at trial. He testified that he had been staying at his grandmother's house, and had heard a car horn honk and thought it was his mother. She had told him she would pick him up that morning. He had finished his bath and had gone outside to find policemen in the street.

Ricky Sellers, the defendant's brother, testified that Sellers admitted shooting Pamela because she was "making a fool out of him." Although the defendant was allowed considerable latitude to show Ricky's hostility toward him, the trial court refused to permit cross examination concerning Ricky's attempted suicide.

James Dudley, neighbor of another of Sellers' brothers, testified that Sellers had come to his house about 2:30 p.m. on August 6 and asked to use his shower and to buy some clothes. The shirt and jeans Sellers was wearing were bloodstained. Sellers gave his nephew, Bobby Smith, those clothes and told him to get rid of them. Smith turned them over to the police.

In the process of choosing a jury, the court excused the only black person in the jury pool. Sellers agrees that this was proper (for the juror's convenience). Nevertheless, he challenged the panel claiming it did not represent a fair cross section of the community; specifically, he argued that blacks were underrepresented. The trial court's rejection of this challenge is the basis for his first assignment of error.

Sellers concedes that the jury selection process used in Pierce County is consistent with statutory requirements,[1] but argues that the statute is invalid. We disagree.

---

[1]The jury administrator testified that prospective jurors were selected from voter registration lists, as required by RCW 2.36.060. The lists contained no information regarding race.

■ Voter registration lists have been held to be the best source from which to obtain a fair cross section of the community. *See Simmons v. United States,* 406 F.2d 456 (5th Cir.), *cert. denied,* 395 U.S. 982 (1969); *State v. Hilliard,* 89 Wn.2d 430, 441, 573 P.2d 22 (1977). Sellers had the burden of proving there had been discrimination in his case. *State v. Hilliard, supra; State v. Johnson,* 7 Wn. App. 445, 500 P.2d 1272 (1972). He produced no such evidence, but only relied on the fact that there were no blacks on the panel. This was not enough.

A defendant is not entitled to exact proportionate racial representation in the jury pool. *Taylor v. Louisiana,* 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692 (1975); *State v. Hilliard,* 89 Wn.2d at 442. The jury need not include even one member of his race. *State v. Salinas,* 87 Wn.2d 112, 114, 549 P.2d 712 (1976). Sellers did not meet his burden. His challenge to the panel was unsupported.

Sellers next contends that the court erred in allowing Ricky to testify concerning his admissions. His attack is premised on the argument that the corpus delicti had not been established before this evidence came in, and, in fact, never was established. The contention would be well taken if the premise were correct. *State v. Fellers,* 37 Wn. App. 613, 683 P.2d 209 (1984). However, it is not correct; the corpus delicti was established.

■ To establish the corpus delicti in a homicide case, two elements must be shown: (1) the fact of death, and (2) the responsibility of a criminal agency for the death. A causal connection between the defendant and the crime is not required, and the elements may be established entirely by circumstantial evidence. *State v. Adams,* 76 Wn.2d 650, 458 P.2d 558 (1969), *rev'd in part on other grounds,* 403 U.S. 947, 29 L. Ed. 2d 855, 91 S. Ct. 2273 (1971); *State v. Smith,* 12 Wn. App. 720, 726, 531 P.2d 843 (1975), *aff'd,* 88 Wn.2d 127, 559 P.2d 970 (1977). The body need not be produced, either.

To require direct proof of the killing or the production of the body of the alleged victim in all cases of homicide

would be manifestly unreasonable and would lead to absurdity and injustice.

The final test is whether the facts found and the reasonable inferences from them have proved the nonexistence of any reasonable hypothesis of innocence. All that is required to prove death is circumstantial evidence sufficient to convince the minds of reasonable men of the existence of that fact. The law employs the judgment of reasonable minds as the only means of arriving at the truth by inference from the facts and circumstances in evidence. If this were not true, an infinite number of crimes involving the elements of a specific intent would go unpunished.

The strict rule contended for by defendant would operate as a complete shield against punishment for his crime and afford him absolute immunity if he were cunning enough to destroy the body or otherwise conceal its identity. But the circumstances surrounding the disappearance of the victim must be such as to convince the mind to a moral certainty of death, and to the exclusion of every other reasonable hypothesis.

(Citation omitted.) *State v. Lung,* 70 Wn.2d 365, 371, 423 P.2d 72 (1967).

At least two people saw the shooting. They saw the gunman put the inert victim in a car and drive away. She met the description of Pamela Sellers, and one witness said she had seen the victim at the Sellers' house before. Nelson, Jr., said he was expecting his mother to pick him up there that morning. Mike Morris, brother of Pamela's boyfriend, said Pamela was supposed to pick up her son by 10 a.m. and had left to do so. There was a "large pool" of blood in the street, and the backseat of Pamela's car was bloodstained. The blood type was the same as Pamela's. Pamela could not be found thereafter. Neither her children nor her boyfriend ever heard from her again. She did not return to her job. The police checked area hospitals without success. There was more than enough evidence to establish both death and criminal agency. Sellers' admission was properly allowed.

Sellers tried unsuccessfully to question Ricky about an attempt to commit suicide 3 to 4 months before the

shooting. He now contends that he should have been permitted to use the incident to show Ricky's instability. Our answer is short. Specific instances of conduct of a witness may not be inquired into on cross examination unless they are probative of truthfulness or untruthfulness. ER 608(b).[2] Unless shown to be the result of some mental disorder, attempted suicide has no bearing on credibility. *See State v. Knapp*, 14 Wn. App. 101, 540 P.2d 898 (1975). There was no such showing.

The statements made by Sellers' son to Detective Lynch at the police station were admitted as excited utterances. ER 803(a)(2). Sellers claims this was error. Significantly, his objection goes only to their use to establish the corpus delicti. We agree that admission of the statements was error. However, the error was not prejudicial because, for the reasons already discussed, the corpus delicti was established without them.

█ The crucial question with regard to excited utterances is whether the statement was made while the declarant was still under the influence of the event to the extent that his statement could not be the result of fabrication, intervening actions, *or the exercise of choice or judgment. Johnston v. Ohls*, 76 Wn.2d 398, 406, 457 P.2d 194 (1969); *State v. Slider*, 38 Wn. App. 689, 692, 688 P.2d 538 (1984). A declarant who is able to give a detailed and complete description of an event is giving a narrative of a past completed affair. This suggests he has had time to collect his thoughts and fabricate, if that suits his purpose. *State v. Dixon*, 37 Wn. App. 867, 874, 684 P.2d 725 (1984).

Immediately after the incident, Nelson, Jr., told officers he had seen nothing. The fact that he changed his story

---

[2]ER 608(b) provides in pertinent part:

"**(b) Specific Instances of Conduct.** Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross examination of the witness (1) concerning his character for truthfulness or untruthfulness, . . ."

later, no matter what the reason, can only demonstrate that he had had the time and the ability to consider various alternatives, and that he had made a judgment about what police should be told. The factors supporting the presumption of reliability underlying the excited utterance exception are not present here.

Sellers' counsel candidly admitted—as well he should—that, as to the evidence of guilt, this evidence was harmless. We agree, and would have so held had his position been otherwise. A defendant's admissions are the most probative and damaging evidence. *See Parker v. Randolph,* 442 U.S. 62, 60 L. Ed. 2d 713, 99 S. Ct. 2132 (1979); *State v. Dictado,* 102 Wn.2d 277, 687 P.2d 172 (1984). Added to these was the testimony of Dudley and Smith about Sellers' suspicious behavior a few hours after the incident, and the physical evidence linking Sellers to the crime. The absence of Nelson, Jr.'s, statement could not have changed the verdict. Therefore, the error was not prejudicial, and the conviction would not have been reversed because of it. *State v. Kelly,* 102 Wn.2d 188, 199, 685 P.2d 564 (1984).

Sellers next assigns error to the admission of the blood-stained shirt and a box of .22 caliber bullets found in Ricky's garage. He contends that their potential for prejudice far outweighed their probative value. We disagree.

When the identity of the perpetrator of a crime is at issue, any evidence tending to identify the accused as the guilty person is relevant. *State v. Coe,* 101 Wn.2d 772, 684 P.2d 668 (1984); *State v. Nichols,* 5 Wn. App. 657, 491 P.2d 677 (1971). Ricky had found the bullets among some things he was storing for Sellers. They were the same caliber as the five casings the police found in the street after the shooting. Sellers' possession of them tended to prove his identity as the gunman. *See State v. Rahier,* 37 Wn. App. 571, 681 P.2d 1299 (1984).

As to the shirt, the witnesses said the gunman had been wearing a light–colored pullover or sweatshirt. The shirt introduced by the State was patterned and brightly colored. However, it was stained with the same type of blood as

Pamela's, and Sellers was eager to get rid of it. It seems obvious that the gunman could have been wearing a shirt under a pullover or sweatshirt. This evidence also tended to connect Sellers to the crime.

It is true that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury. ER 403; *State v. Rupe,* 101 Wn.2d 664, 686, 683 P.2d 571 (1984). However, the trial court has wide discretion in balancing the probative value against the potential harm, and its decision will not be overturned absent a showing of abuse. *State v. Coe,* 101 Wn.2d at 782. We see no abuse here.

We find no merit in Sellers' next contention, that a lab report showing Pamela's blood type was inadmissible because neither the technician who had done the tests nor his supervisor was called to authenticate it. The report was part of her physician's file and was identified by him. It was admitted as a business record under RCW 5.45.020.[3] The statute does not require that the record be made by the person performing the lab test, but only that it was made in the regular course of business under circumstances which the court finds makes it trustworthy. *State v. Rutherford,* 66 Wn.2d 851, 405 P.2d 719 (1965), *appeal dismissed, cert. denied,* 384 U.S. 267 (1966). *See also State v. Kreck,* 86 Wn.2d 112, 542 P.2d 782 (1975); *State v. Boehme,* 71 Wn.2d 621, 430 P.2d 527 (1967), *cert. denied,* 390 U.S. 1013 (1968). A practicing physician's records, made in the regular course of business, properly identified and otherwise relevant, constitute competent evidence of a condition therein recorded. *Benjamin v. Havens, Inc.,* 60 Wn.2d 196, 200, 373

---

[3]RCW 5.45.020 provides:

"Business records as evidence. A record of an act, condition or event, shall in so far as relevant, be competent evidence if the custodian or *other qualified witness* testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission." (Italics ours.)

P.2d 109 (1962). The blood tests were requested and used by Pamela's physician in his treatment of her for two pregnancies and other health matters during her 8 years as his patient. That is very convincing evidence of their trustworthiness. The report was properly admitted.

Finally, Sellers contends that he should have been granted a new trial on the basis of newly discovered evidence, because Sellers' attorney discovered after the trial that Detective Lynch had either lied to Seattle police or neglected to inform them of an illegal search he had made of a suspect's suitcase in another case.[4] We disagree.

When the only purpose of new evidence is to impeach or discredit evidence produced at trial, a new trial cannot be properly granted. *State v. Edwards,* 23 Wn. App. 893, 898, 600 P.2d 566 (1979); *State v. Epton,* 10 Wn. App. 373, 379, 518 P.2d 229 (1974). The "new" evidence was merely impeaching.

Moreover, a new trial is not warranted unless the moving party can demonstrate that the new evidence will probably change the result of the trial. *State v. Koloske,* 100 Wn.2d 889, 898, 676 P.2d 456 (1984). Lynch's only testimony of substance concerned Nelson, Jr.'s, statements. We have already determined that this evidence was harmless. Discrediting Lynch would not have changed the verdict.

Affirmed.

ALEXANDER, J., and PETRIE, J. Pro Tem., concur.

Review denied by Supreme Court May 10, 1985.

---

[4]Lynch's conduct was mentioned in *State v. Moore,* 29 Wn. App. 354, 628 P.2d 522 (1981).