[No. 9282-4-II.   Division Three.   August 25, 1987.]

THE STATE OF WASHINGTON, *Respondent,* v. EUGENE QUILLIN, *Appellant.*

*Barton L. Adams* and *Adams, Gagliardi & Halstead,* for appellant (appointed counsel for appeal).

*John W. Ladenburg, Prosecuting Attorney,* and *Chris Quinn–Brintnall, Deputy,* for respondent.

McINTURFF, C.J.*—Eugene Quillin was convicted after a jury trial of the first degree felony murder of Chris Duffy, second degree possession of stolen property, and first degree malicious mischief. He appeals his conviction of first degree felony murder, arguing his confession should have been suppressed, and that the State did not prove the corpus delicti or the underlying felony (robbery) for felony murder. We affirm.

## EQUIVOCAL REQUEST FOR COUNSEL

The first issue is whether the court erred in failing to exclude Mr. Quillin's confession at the suppression hearing.

Mr. Quillin contends the court should have excluded his confession upon finding the deputies continued to question him after his equivocal request for counsel. The facts relevant to this contention are as follows:

At the suppression hearing, Deputy Page testified that after he arrested Mr. Quillin he read him the *Miranda*

---

*This case was heard by a panel of Division Three judges sitting in Division Two.

rights and asked him if he wished to make a statement. Deputy Page included in his report and confirmed at trial that Mr. Quillin then said: "I don't know if I should make any statement or not without my lawyer" and that he added the question, "what do you think?" Then Deputy Page told him he could not give him any advice one way or the other; that he had to make his own decision; to please keep his rights in mind; that he need not say anything; and that he does have the right to have an attorney present during any questioning. Again Mr. Quillin asked the deputy his opinion, "what do you think?"

Deputy Page testified the questioning stopped while Mr. Quillin was taken to the county/city building. Deputy Reed advised him of his rights from a form, and had him initial each paragraph on the rights form and sign the rights form. Deputy Page read the waiver of constitutional rights to Mr. Quillin. Deputy Page, in his report, indicated Mr. Quillin was very unsure about signing the waiver form and asked him, "Do you think I should sign it? Deputy Page told Mr. Quillin he could not advise him. Deputy Page's report indicates he appeared "indecisive". Mr. Quillin then said, "Well, I just can't make up my mind if I should sign that or not." Deputy Page wrote "refused" on the waiver form. As soon as Deputy Page wrote "refused" on the form, Mr. Quillin stated, "I didn't refuse to sign that. I just can't make up my mind if I want to do it yet or not."

Deputy Reed returned to the room and asked Mr. Quillin if he had refused to sign the waiver. He told the deputy he had not refused to sign the waiver, but just couldn't make up his mind at this point whether to sign. Deputy Reed asked Mr. Quillin if he would be willing to answer his questions and he said he would. Deputy Reed did not ask him to sign a waiver of his constitutional rights at this time. Deputy Reed and Mr. Quillin began talking about the vehicle. Deputy Reed then told him he would like to take a tape–recorded statement and that he would administer his *Miranda* rights again. Mr. Quillin again asked Deputy Reed whether he thought he should have an attorney. Deputy

Reed told him he could not answer that question and if he asked for an attorney, Deputy Reed would stop asking questions and he should either say yes he wanted an attorney or no he did not and the decision was his. Deputy Reed said Mr. Quillin sat for approximately 30 seconds, then he said "No" and shook his head back and forth. He told Deputy Reed he would tell him what happened, but if he said anything he would go to prison. Deputy Reed told him at this point all he wanted was the truth. Mr. Quillin sat for a few minutes and began to cry. Deputy Reed asked him if Chris was dead, and Mr. Quillin replied, "Yes." Deputy Lawrence arrived, upon notification to the prosecutor's office that a possible homicide was involved. Deputy Lawrence readvised Mr. Quillin of his *Miranda* rights. He signed a waiver of his *Miranda* rights.

Mr. Quillin agreed to show the deputies the homicide scene. He directed the deputies to the area where he said the murder weapon, a knife, was thrown from the car, but it was not recovered. They did recover an umbrella, a pair of glasses, and some papers that had been thrown from the stolen car. They also recovered two tennis shoes. Then Mr. Quillin pointed out an area in front of a bridge where he said the murder took place and showed the deputies where the body had been thrown from a bridge. Mr. Quillin discussed descriptions of the victim's clothing, the weapon and where the acts had taken place.

The deputies took Mr. Quillin back to the county/city building, readvised him of his *Miranda* rights on tape and Mr. Quillin said he was willing to make a statement. He signed the 32–page statement after it was transcribed and following a suppression hearing, the statement was introduced at the trial of Mr. Quillin. The statement placed blame for the murder on Jim Dunlap; Mr. Quillin admitted he was there and helped throw the body off the bridge.

At the suppression hearing, Mr. Quillin stated he told the arresting officers he wanted an attorney on the way down to the county/city building and had repeated the request, but the court found he had not requested an attorney.

Police are not prohibited under the Sixth Amendment from initiating conversations with the accused in the absence of counsel if defendant has not previously invoked the right, is given warnings, and makes a valid waiver. *Michigan v. Jackson,* 475 U.S. 625, 89 L. Ed. 2d 631, 106 S. Ct. 1404, 1407 (1986); *State v. Vidal,* 82 Wn.2d 74, 78, 508 P.2d 158 (1973).

However, when a suspect invokes the right to counsel, all questioning must stop unless the accused himself initiates further communications. *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 1612, 10 A.L.R.3d 974 (1966); *State v. Robtoy,* 98 Wn.2d 30, 35, 653 P.2d 284 (1982).

There is a limited exception, for equivocal statements, to the rule that all questioning must stop. *Robtoy,* at 39. An equivocal request for an attorney is one that expresses both a desire for counsel and a desire to continue the interview without counsel. *Robtoy,* at 38. Any questioning after the equivocal assertion of the right to counsel must be strictly limited to clarifying the suspect's wishes. *Robtoy,* at 39.

We focus on Mr. Quillin's second and third equivocal requests for counsel because no questioning by the officers followed the equivocal request made by Mr. Quillin before transport to the county/city building. We must decide if Mr. Quillin's response that he is not refusing to sign the form is adequate clarification to the officers of Mr. Quillin's desire not to have counsel. At this point, the questioning continued about the vehicle and Mr. Quillin's association with Mr. Duffy. This was followed by a third equivocal request for counsel when the officers asked if they could take a taped statement. The officers responded to the equivocal request by telling Mr. Quillin they could not advise him and that he should say "yes" he wanted an attorney, or "no" he did not. Mr. Quillin responded "No."

In *Robtoy,* at 41, the court found the totality of the circumstances indicated Robtoy made a voluntary, knowing, and intelligent waiver, focusing on Robtoy's awareness he

could terminate questioning at any point, his several experiences of being informed of and exercising his *Miranda* rights, and the fact that he did not again request an attorney after the pause in questioning. Robtoy did not sign a waiver form after his equivocal request for counsel before speaking further with the officers. *Robtoy,* at 40.

In conclusion, as to disputed fact 2, the court found:

> The investigating officers proceeded with great care regarding Mr. Quillin's right to have an attorney, providing him time to make a decision, and only after Mr. Quillin stated that he had not refused to waive his rights but had only wanted time to think about whether he would discuss the matter, did the officers begin discussing victim's disappearance.

In a Texas case, *Russell v. State,* 727 S.W.2d 573 (Tex. Crim. App. 1987), the defendant asked his interrogators several times whether an attorney was necessary. *Russell* concluded it was appropriate for the officers to refuse to express an opinion on whether the defendant should have counsel, remind the defendant of his rights and ask whether he wished to continue the interview. These cases convince us the officers' responses to Mr. Quillin's equivocal requests for counsel were appropriate and resulted in clarification that he did not want counsel present at this stage of questioning.

We hold it was not error to allow Mr. Quillin's statements to be introduced at trial.

## CORPUS DELICTI

The second issue is whether the court erred by allowing into evidence defendant's admissions regarding the crime of murder prior to proof of its corpus delicti.

Chris Duffy disappeared; his body was never found. A blue Pontiac Firebird, owned by Chris Duffy's mother, was stolen at the same time Mr. Duffy disappeared; his mother believed he took the car after removing the key from her key chain. Mr. Quillin was seen driving in a blue Pontiac Firebird for several days after Chris Duffy disappeared and the car was found burned and abandoned. Witnesses testi-

fied Mr. Quillin burned the car. Mr. Quillin was arrested for possession of stolen property that had been in the car owned by Chris Duffy's mother when it was stolen.

Mr. Quillin and James Dunlap (Mr. Quillin's half-brother) were acquainted with Mr. Duffy. Following investigation, both Mr. Dunlap and Mr. Quillin were charged with the murder of Mr. Duffy. Mr. Dunlap pleaded guilty to second degree murder. Mr. Quillin did not testify at his trial, nor did Mr. Dunlap. However, Mr. Quillin's transcribed and signed statement to the police was admitted at trial. Witnesses testified about statements Mr. Quillin made to them in which he admitted killing Chris Duffy.

Here, a witness testified Mr. Duffy was going to meet "Gene" on the night he disappeared. Also, a store clerk said Mr. Duffy was seen with two men that night, one of whom he identified as Mr. Dunlap. Physical evidence included clothing Chris Duffy was last seen wearing and property which had been in the Pontiac Firebird.

Mr. Quillin contends it is clear in Washington that *prior* to use of an accused's confession at trial the State must establish the corpus delicti of the crime charged by independent evidence. *Bremerton v. Corbett,* 106 Wn.2d 569, 576, 723 P.2d 1135 (1986); *State v. Fellers,* 37 Wn. App. 613, 615, 683 P.2d 209 (1984).

The State, however, contends proof of the corpus delicti prior to admission of defendant's statements was not required, citing 40 Am. Jur. 2d *Homicide* § 285, at 551 (1968), stating in part:

> *it has been asserted in a prosecution for such offense that a confession may be received in evidence in advance of proof of the corpus delicti, since the accused will be acquitted in any event, unless proof of the corpus delicti independent of the confession is produced.*

(Footnote omitted. Italics ours.)

We need not decide whether the corpus delicti rule in Washington mandates that the State always prove corpus delicti before the defendant's statements are admissible, because there was adequate evidence admitted before Mr.

Quillin's statements to prove the corpus delicti.

██ ██ The corpus delicti rule protects the defendant from the possibility of an unjust conviction based on a false confession alone. *Bremerton,* at 576. Proof of corpus delicti is sufficient if it supports a logical and reasonable inference that the charged crime occurred. *State v. Fagundes,* 26 Wn. App. 477, 484, 614 P.2d 198, 625 P.2d 179, *review denied,* 94 Wn.2d 1014 (1980). Such evidence need not show the corpus delicti beyond a reasonable doubt or by the preponderance of the evidence. *Bremerton,* at 578. The elements of corpus delicti in a homicide case are: (1) the fact of death, and (2) the responsibility of a criminal agency for the death. *State v. Lung,* 70 Wn.2d 365, 371, 423 P.2d 72 (1967); *State v. Sellers,* 39 Wn. App. 799, 802, 695 P.2d 1014 (1985). A causal connection between the defendant and crime is not required, and the elements may be shown entirely by circumstantial evidence; the body need not be produced. *Lung,* at 371.

In *Sellers,* although the victim's body was never found, the corpus delicti was established when two people saw the shooting, and blood of the same type as the victim's was found in the street and the victim's car. *Sellers,* at 803.

The evidence admitted prior to Mr. Quillin's statement to the police and which establishes corpus delicti includes proof of Chris Duffy's disappearance, identification of the clothing Chris was wearing when he was last seen, and identification of personal effects found in the Pontiac Firebird owned by Chris Duffy's mother, including a set of encyclopedias and a spare tire. There was additional evidence that Mr. Duffy had said he was going to meet "Gene" (Quillin) just prior to his disappearance. There was also evidence Mr. Quillin was in possession of the Firebird without the owner's permission and that he also possessed the spare tire and encyclopedias from the Firebird.[1]

---

[1]Although not considered for the purpose of corpus delicti, following admission of Mr. Quillin's statements to the police and others, there was expert testimony that a blood stain found on Jim Dunlap's pants was the same blood type as

On the other hand, neither the victim's body nor the murder weapon was found. James Dunlap, the only person besides Mr. Quillin who could have testified directly of Chris Duffy's death and Mr. Quillin's possible involvement, was not called by either the State or defense in Mr. Quillin's trial. Mr. Quillin did not testify. Furthermore, the claimed location of the murder did not reveal any clues to Mr. Duffy's fate.

Cases from other jurisdictions have found corpus delicti existed on circumstantial evidence even less convincing than that found here.[2] In *Derring v. State,* 273 Ark. 347, 619 S.W.2d 644, 647–48 (1981) the facts were strikingly similar. The victim, whose body was never recovered, disappeared after he was seen picking up a hitchhiker in his

---

either the victim or Jim Dunlap, but not that of Mr. Quillin. A blood stain on a pair of shoes could not be typed. There was testimony that Mr. Duffy's clothing was in the possession of Mr. Quillin and Mr. Dunlap following Mr. Duffy's disappearance and that Mr. Dunlap and Mr. Quillin were seen with mud on their clothing after Mr. Duffy's disappearance. Mr. Duffy's leather jacket was seen in their possession and reportedly had reddish–brown mud stains on the collar. The jacket was not recovered. Mr. Dunlap gave some of Mr. Duffy's clothing to Yvonne Hamrick. A witness testified Mr. Quillin was in possession of a box knife before Mr. Duffy's disappearance. Another witness said Mr. Dunlap and another person were seen with Mr. Duffy on the night of his disappearance, and one of these persons had a box knife.

[2]In *Warmke v. Commonwealth,* 297 Ky. 649, 180 S.W.2d 872, 873–74 (1944), corpus delicti was proved although the body of a baby was never recovered. A woman's confession that she threw her baby into a flooded creek was admissible. Corpus delicti was proven by showing the woman had given birth to an illegitimate child, it was missing, and she had a compelling motive to conceal the birth of the illegitimate child. A coat the baby had been wrapped in was found and likely would have been dropped into the creek as well if the baby had accidentally been dropped, and the woman did not tell anyone about the accidental dropping of the baby if, in fact, it had occurred and would likely have told someone in such a case.

In *People v. Cullen,* 37 Cal. 2d 614, 234 P.2d 1, 6 (1951), defendant's wife and father, with whom defendant lived, disappeared and their bodies were never found. Corpus delicti was shown when defendant appeared in a town with the father's pension check after their disappearance, having forged the father's name. Wet spots containing human blood were found in the carpet of the cabin where all three people lived and bloody garments were also found on the premises. *People v. Cullen,* 234 P.2d at 2–6.

car on the way to school. He never arrived. The defendant attempted to sell the victim's car to a junk dealer. A search of the car revealed personal papers of the victim; more personal property of the victim was found in a trash can behind a residence where the defendant was staying. The court found corpus delicti independent of the defendant's statement that he had shot a man with a revolver and thrown his body off a bridge.

The circumstantial evidence presented by the State is sufficient to support a logical and reasonable inference of the fact of Chris Duffy's death and the responsibility of a criminal agency for that death.

### ROBBERY AS AN UNDERLYING FELONY

The third issue is whether the State failed to prove the elements of first degree felony murder.

■ In reviewing the sufficiency of the evidence to support a guilty verdict in a criminal case, an appellate court views the evidence most favorably to the State and determines whether any rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Green,* 94 Wn.2d 216, 221, 616 P.2d 628 (1980).

■■ To convict a defendant of felony murder the State is required to prove beyond a reasonable doubt each element of the predicate felony. *State v. Gamboa,* 38 Wn. App. 409, 412, 415, 685 P.2d 643 (1984). Here, the underlying felony to support the charge of first degree felony murder against Mr. Quillin was robbery. RCW 9A.32.030 provides that robbery 1 or 2 is a predicate offense to support a charge of first degree felony murder.[3] Intent to deprive the victim of the property is a necessary element of

---

[3]Robbery is defined by RCW 9A.56.190:

"A person commits robbery when he unlawfully takes personal property from the person of another or in his presence against his will by the use or threatened use of immediate force, violence, or fear of injury to that person or his property or the person or property of anyone. Such force or fear must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking; in either of which cases the degree of force is immaterial. Such taking constitutes robbery whenever it appears that, although the taking was fully completed

the offense of robbery. *State v. Faucett,* 22 Wn. App. 869, 872, 593 P.2d 559 (1979). First degree felony murder requires no specific criminal mental state other than the one necessary for the predicate crime—in this case, robbery in the first degree. *State v. Frazier,* 99 Wn.2d 180, 661 P.2d 126 (1983).

Here the State's witnesses provide substantial evidence that Mr. Quillin took personal property (the car) from the victim by using force (the box knife) and that either Mr. Quillin or Mr. Dunlap caused the death of the victim in so doing. The crucial issue is whether there was sufficient evidence to conclude beyond a reasonable doubt that Mr. Quillin intended to take the car from the victim.

The substance of Mr. Quillin's taped statement is that Mr. Dunlap had become involved in a fight with Chris Duffy and had cut Chris Duffy's throat with a box cutter. Jeffrey Peidgo said Mr. Quillin told him they had gotten into a fight with Chris Duffy in which he had thrown Chris Duffy to the ground and cut him in the neck. Patrick McDonald testified Mr. Quillin told him he killed Chris Duffy; that he took Chris Duffy up to the Elbo Lake area to kill him because he had given Chris Duffy $2,000 for the car and Chris Duffy had not given him the title. Ray Manchester testified Mr. Quillin told him that he obtained the gun he was trying to sell Mr. Manchester by breaking a guy's neck, that Mr. Quillin told him he had scuffled with a guy and heard his neck break and that then they cut his neck and threw him over a bridge. Ray Manchester further testified Mr. Quillin told him the reason for the scuffle was Chris Duffy did not want Mr. Quillin to drive his mother's car. Although the above testimony shows evidence of intent to be in dispute, Patrick McDonald's testimony supplies the requisite proof of Mr. Quillin's intent to deprive the victim of his property. Therefore, there is substantial evidence to support the felony murder conviction, based on

without the knowledge of the person from whom taken, such knowledge was prevented by the use of force or fear."

robbery, beyond a reasonable doubt.

Mr. Quillin's conviction of first degree felony murder is affirmed.

GREEN and MUNSON, JJ., concur.

Review denied by Supreme Court January 7, 1988.