## NOTICE:  SLIP OPINION
### (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Marriage of | No. 82091-5-I |
| NICOLAAS CORNELIUS DEVOGEL, | (consolidated with No. 82267-5-I) |
| Respondent, | DIVISION ONE |
| v. | PUBLISHED OPINION |
| HEIDI ANN PADILLA, | |
| Appellant. | |

SMITH, A.C.J. — After ending their marriage in 2017, Nicolaas DeVogel and Heidi Padilla each asked the court to modify their parenting plan in 2019. The court entered a new parenting plan placing the parties' children with DeVogel, entered a new child support order, and ruled on motions for correction of a clerical mistake and for contempt of court. Padilla appeals the court's handling of RCW 26.09.191 restrictions in the final parenting plan, certain aspects of the child support orders, the court's denial of her motions for contempt against DeVogel, the court's amendment of the modified parenting plan, the court's retention of jurisdiction, and the court's exclusion of certain testimony at trial as hearsay. We conclude that the court erred by ordering Padilla to pay a portion of a bill that was DeVogel's sole responsibility. Because the court complied with RCW 26.09.191 and did not otherwise err, we affirm in part and remand only to correct Padilla's payment obligation.

No. 82091-5-I/2

FACTS

Padilla and DeVogel were married in July 2005. They had two children, N.D. and A.D. DeVogel also eventually adopted Padilla's older son, Brandon. The parties separated in 2014, and in 2017, the court entered a dissolution order and a parenting plan with respect to N.D. and A.D. The court found that DeVogel had a history of domestic violence (DV) based on physical violence toward Brandon and that Padilla had other parental problems including withholding the children and abusive use of conflict. The court gave Padilla sole decision-making power for educational and health care issues and placed the children with her for a majority of the residential time. The parenting plan required DeVogel to complete DV treatment and the "DV Dads" program before his residential time increased to overnights every Wednesday and every other weekend.

The entry of the parenting plan was followed by many contentious communications between the parties; failed exchanges of the children; motions for contempt; and referrals to the Department of Children, Youth and Families (DCYF) for allegations of abuse and neglect against DeVogel ranging from exposure to pornography, physical violence, and medical neglect. In January 2019, Padilla and DeVogel each petitioned to amend the parenting plan. Padilla asked for DeVogel's visits to transition to supervised, and DeVogel asked for majority residential time. In March, the court entered a temporary parenting plan giving DeVogel a majority of residential time with the children and sole decision-making authority regarding school, health care, and child care.

2

A guardian ad litem (GAL) was appointed and issued an extensive report. She reported that while DeVogel had "engaged in a long-term pattern of domestic violence" toward Padilla and their children, Padilla had "engaged the children in the parents' conflict, [had] intentionally interfered with the children's time and relationship with [DeVogel], and [had] coached the children as to language to describe [DeVogel] and the conclusions they should draw about him, without seeming to recognize the detrimental impact these behaviors had on the children." She found that DeVogel had "made more progress in addressing his deficiencies than" Padilla and that while residing with DeVogel "the children seem happy, are cared for, and express affection and positive feelings for him. Once back with their mother, they return to the narrative of his being an abusive, unsafe person."

In July 2020, the parties proceeded to trial, at which the GAL, the parents, family members, the coordinator of special education services in the children's school district, and the children's reunification therapist all testified. The court entered a final parenting plan placing the children with DeVogel the majority of the time and giving him sole decision-making authority. In unchallenged findings, the court noted that before switching residences, N.D. had been "demonstrating incredibly concerning behavior," including refusing to go to school, acting aggressively, starting fires, and running away. But since moving to DeVogel's house, N.D. had been "attending school as required" and "the concerning behavior he manifested in the past has decreased if not almost entirely

3

disappeared." The court noted that it found the GAL's testimony to be "extremely insightful and credible."

The court also entered a child support order finding that Padilla, who worked as a substitute teacher, was voluntarily underemployed, imputing income to her at her current rate of pay, and directing Padilla to pay DeVogel $5,522 in past due child support.

Since trial, the court has denied an emergency temporary custody order based on Padilla's evidently unsupported belief that A.D. was being sexually abused because she had blisters on her genitals and motions for contempt from both parents. The court also granted DeVogel's motion to correct clerical mistakes in the parenting plan.

Padilla appeals.

## ANALYSIS

### RCW 26.09.191 Restrictions for Domestic Violence

Padilla first contends that the court erred by awarding sole decision-making and majority residential time to DeVogel despite his history of DV because it did not enter findings that DeVogel would not cause harm to the children and that the probability the harmful conduct would recur was remote. We conclude that the court did not err.

We review a trial court's parenting plan for abuse of discretion. Katare v. Katare, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). "An abuse of discretion occurs when a decision is manifestly unreasonable or based on untenable grounds or untenable reasons." Id. In modifying a parenting plan, "a court abuses its

4

discretion if it fails to follow the statutory procedures." In re Marriage of Watson, 132 Wn. App. 222, 230, 130 P.3d 915 (2006). "We consider statutory construction as a question of law requiring de novo review." Id.

First, the court did not err by giving DeVogel sole decision-making authority. RCW 26.09.191(1) provides that "[t]he permanent parenting plan shall not require mutual decision-making . . . if it is found that a parent has . . . a history of acts of domestic violence." Padilla contends that this section should be construed as forbidding the court from giving the parent with a history of domestic violence any decision-making authority, but by its plain language it only prohibits "mutual decision-making." RCW 26.09.191(1). "We cannot add words or clauses to an unambiguous statute when the legislature has chosen not to include that language." State v. Delgado, 148 Wn.2d 723, 727, 63 P.3d 792 (2003). The plan gave DeVogel sole decision-making authority and did not order mutual decision-making. Therefore, the court's parenting plan did not violate this section.

Second, the court did not err by placing the children with DeVogel for the majority of the time. If a parent has a history of domestic violence, the "parent's residential time with the child shall be limited" and these limitations "shall be reasonably calculated to protect the child" and the other parent from abuse or harm. RCW 26.09.191(2)(a), (2)(m)(i). "The limitations the court may impose include, but are not limited to: Supervised contact between the child and the parent or completion of relevant counseling or treatment."

5

RCW 26.09.191(2)(m)(i). The court can only choose to not impose limitations based on a history of DV under RCW 26.09.191(2) if it "expressly finds . . . that contact between the parent and the child will not cause . . . harm to the child and that the probability that the parent's . . . harmful or abusive conduct will recur is so remote that it would not be in the child's best interests to apply the limitations," or that the parent's conduct did not impact the child. RCW 26.09.191(2)(n).

Here, the parties' original parenting plan placed a limitation on DeVogel's time with his children because of his DV history, requiring DeVogel to complete DV treatment and the DV Dads program before DeVogel could get more residential time with the children. Completion of treatment is a limitation specifically contemplated by RCW 26.09.191(2)(m)(i). As noted in the GAL report, DeVogel did indeed complete both of these programs, "with the treatment provider believing he had internalized the information and seeing him as a positive group member." At the time the court entered the amended parenting plan, it found that there had been no instances of domestic violence since the parties separated. We conclude that the court was not required to impose new limitations on DeVogel when the court knew that he had completed the limitations described in the original parenting plan and there were no new domestic violence concerns.[1]

---

[1] Indeed, "[a] parent with whom the child does not reside a majority of the time who is required by the existing parenting plan to complete evaluations, treatment, parenting, or other classes may not seek expansion of residential time . . . unless that parent has fully complied with such requirements." RCW 26.09.260(9).

Padilla disagrees, contending that the court's finding that DeVogel had not perpetrated domestic violence since the parties' separation is not supported by substantial evidence because DeVogel had participated in the Family Assessment Response (FAR) program since then. Padilla contends that "[a] family may only end up in FAR if there are credible allegations of child abuse or neglect" but her citations do not support this conclusion. RCW 26.44.020(13) merely provides that FAR is "a way of responding to certain reports of child abuse or neglect made under this chapter using a differential response approach to child protective services." Contrary to Padilla's contention, the record establishes that the court was aware that DeVogel had been named in dozens of DCYF reports, but that none of these resulted in founded findings. Moreover, an allegation of child neglect is not necessarily an allegation of domestic violence. Therefore, the court's finding that no credible evidence established that DeVogel had engaged in domestic violence since the parties' separation is supported by substantial evidence, and the court's parenting plan does not violate RCW 26.09.191.[2]

---

[2] We also note that the court's decision to change the children's residence was not just based on its findings about the children's wellbeing in DeVogel's home but also about the children's wellbeing in Padilla's home. The court found:

> The children's environment at the mother's home was detrimental to the children's physical, mental and emotional health. Harm likely to be caused by a change of environments–from the mother's primary residential custody to the father's primary residential custody–is outweighed by the advantage of the change for the children.

Given these findings, it appears that the court appropriately exercised its discretion.

7

Finding of Abusive Use of Conflict

Padilla contends that the court erred by (1) finding that Padilla was typically the reporter or provider of information to the reporter for Child Protective Services (CPS) referrals and (2) entering an abusive use of conflict finding against Padilla on this basis. We conclude that both findings are supported by substantial evidence.

"Findings of fact are reviewed under a substantial evidence standard, defined as a quantum of evidence sufficient to persuade a rational fair-minded person the premise is true." Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). "We will not substitute our judgment for the trial court's, weigh the evidence, or adjudge witness credibility." Greene v. Greene, 97 Wn. App. 708, 714, 986 P.2d 144 (1999). "We need determine only whether the evidence most favorable to the prevailing party supports the challenged findings, even if the evidence is in conflict." Thomas v. Ruddell Lease-Sales, Inc., 43 Wn. App. 208, 212, 716 P.2d 911 (1986).

Here, substantial evidence supports the court's finding that Padilla "has typically either been the reporter or the provider of information to the reporter" out of 55 CPS referrals for the family. The GAL report lists 57 referrals to CPS as of August 19, 2019.[3] Of these, 16 referrals explicitly reference information as coming from Padilla. One states that Padilla seems to have been the reporter.

---

[3] Many of these referrals were screened out as duplicates. The court's finding that there had been 55 CPS referrals seems to be based on DeVogel's testimony that there had been 55 CPS investigations total.

8

Intake reports elsewhere in the record establish Padilla was the source of the

information for more of these reports. Furthermore, as DeVogel testified, "many

of the reports had very specific information that would only be obtained through

[Padilla's] connection or intervention." The GAL report included a statement from

A.D.'s principal that she "has made multiple calls to CPS. She is a mandated

reporter and had to pass on information she had heard from [Padilla.]" Given all

this information in the record, substantial evidence supports the court's finding

that Padilla has typically been the source of information for Department of Social

and Health Services (DSHS) referrals.

Furthermore, substantial evidence supports the court's finding that these

referrals constitute an abusive use of conflict.[4] RCW 26.09.191(3)(e)[5] provides

that the court may limit provisions of the parenting plan if there is an "abusive use

of conflict by the parent which creates the danger of serious damage to the

child's psychological development." Here, the court found that the frequent

referrals "exacerbate[ ] the already high level of tension between the parents,

thereby resulting in unnecessary anxiety in the children." This finding is

supported by substantial evidence in the record, including, for instance, the

Family Court Services report that Padilla's "hypervigilant behaviors, apparent

---

[4] Padilla's argument that these referrals did not constitute an abusive use of conflict because she is a mandatory reporter is unpersuasive. Because Padilla herself was not the referrer for the majority of these referrals, and given the high number of reports that did not allege new facts or facts amounting to neglect or abuse, her status as a mandatory reporter is largely irrelevant.

[5] RCW 26.09.191 has been amended since the events in this matter transpired. Because these amendments do not affect our analysis, we cite to the current version. *See* LAWS OF 2020, ch. 311, § 8; LAWS OF 2019, ch. 46, § 5020.

anxiety, and her negative perception of the father[ ] have directly impacted the children and their perception of the father." It is also supported by the court's other unchallenged findings, including that Padilla

> "keep[s] the children at a high stress level and keep[s] them from [creating a] positive relationship with their father. . . . Once back with their mother, they return to the narrative of [DeVogel] being an abusive, unsafe person. This dichotomy can lead to their questioning reality and their own sense of themselves, and perhaps has contributed to the children's current psychological issues."

Unchallenged findings are verities on appeal. Zunino v. Rajewski, 140 Wn. App. 215, 220, 165 P.3d 57 (2007). The trial court's finding that Padilla used conflict in an abusive way is supported by substantial evidence. See also Burrill v. Burrill, 113 Wn. App. 863, 872, 56 P.3d 993 (2002) ("This severe impairment of parent/child contact, especially when considered in light of the numerous interviews [the child] was subjected to asking her about the bad things her daddy did to her, constitutes sufficient evidence from which the trial court could conclude that [the mother] created a danger of serious psychological damage.").

### Child Support Orders

Padilla challenges the court's Child Support Order, which found that Padilla was underemployed, imputed income to her, and awarded DeVogel $5,522 in past due child support from May 2019 to May 2020. We conclude that the court did not abuse its discretion.

"The trial court has broad jurisdiction to modify child support provisions." Goodell v. Goodell, 130 Wn. App. 381, 388, 122 P.3d 929 (2005). Accordingly, we "apply an abuse of discretion standard and 'cannot substitute [our] judgment

10

for that of the trial court unless the trial court's decision rests on unreasonable or untenable grounds.' " Id. (alteration in original) (quoting In re Marriage of Dodd, 120 Wn. App. 638, 644, 86 P.3d 801 (2004)).

1. Imputation of Income

RCW 26.19.071(6) provides that the court "shall impute income to a parent when the parent is . . . voluntarily underemployed." The court makes the determination of whether a parent is voluntarily underemployed

> based upon that parent's assets, residence, employment and earnings history, job skills, educational attainment, literacy, health, age, criminal record, dependency court obligations, and other employment barriers, record of seeking work, the local job market, the availability of employers willing to hire the parent, the prevailing earnings level in the local community, or any other relevant factors.

RCW 26.19.071(6). "Voluntary underemployment" is underemployment that is brought about by one's own free choice and is intentional. In re Marriage of Neumiller, 183 Wn. App. 914, 924, 335 P.3d 1019 (2014).

At the time of trial in July 2020, Padilla was earning a master's degree in education at the University of Washington (UW) and collecting $4,188 in unemployment benefits monthly. Padilla anticipated that her unemployment benefits would end in July and that she would begin work in August, likely on a schedule of two to four hours a day, two days a week. Padilla contends that this underemployment was a result of school closures related to the Covid-19[6] pandemic that put her out of work as a substitute school teacher. But she points

---

[6] COVID-19 is the World Health Organization's official name for "coronavirus disease 2019," a severe, highly contagious respiratory illness that quickly spread throughout the world after being discovered in December 2019.

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

to no evidence rebutting the court's finding that "there was no credible evidence establishing that the mother has made reasonable unsuccessful attempts to obtain employment commensurate with her skills, education and abilities."  To the extent that the limit on her work hours was a result of her educational program, her argument fails because the evidence indicated that she enrolled in this program prior to Covid-19.  Because evidence supports the court's finding that Padilla was voluntarily underemployed, the court did not abuse its discretion by imputing income to Padilla.

2.  Counseling Expenses

Padilla next contends that the court erred in ordering her to pay $5,522 in past due child support.  This number came from records of payments for shared expenses, categorized as "childcare," that DeVogel submitted.  DeVogel included non-childcare payments in this category by mistake, including checks to the reunification counselor, Yvonne Clayton.  These included a check for $500 on May 25, 2019, and checks for $200 on September 4, October 1, and November 25, 2019.  However, prior to August 30, 2019, DeVogel was supposed to pay 100% of reunification counseling expenses.

Padilla makes no argument and cites no law explaining why DeVogel's mischaracterization of these payments as childcare should prevent her from paying her court-ordered share of them, so we need not address this assignment of error.  See Brown v. Vail, 169 Wn.2d 318, 336 n.11, 237 P.3d 263 (2010) (a party that fails to brief an assignment of error waives the assignment).  However,

Padilla is correct that the first $500 check to Clayton was not an expense that the parties were supposed to share proportionally, but was instead DeVogel's responsibility alone. Therefore, we remand for the court to remove that expense (and corresponding interest) from the court's calculation of past due child support.[7]

DeVogel disagrees and contends that we need not disturb the order, citing In re Marriage of Pilant, 42 Wn. App. 173, 181, 709 P.2d 1241 (1985). In that case, the court held that the "erroneous valuation of one item in this particular case, does not require reversal of the otherwise fair and equitable distribution of an estate worth between $546,000 and $675,000." Id. That was a division of property issue, in which courts have broad discretion to "arrive at a just and equitable disposition of the property and liabilities of the parties." Id. at 176. But DeVogel cites no case where an appellate court upheld an erroneous child care order because it was mostly correct. Because the court's decision rests on untenable grounds, and is therefore an abuse of discretion, we conclude that the court must correct this error on remand.

---

[7] Padilla also contends that she should not pay any portion of the payments to Clayton after August 30, 2019, because contrary to the court's order, Clayton did not permit Padilla to participate in reunification therapy. But Padilla does not establish that the court abused its discretion by nonetheless requiring proportional payment in accordance with its order, especially because Clayton's work was mainly one-on-one sessions with the children.

Contempt of Court

Padilla next challenges the court's denial of her motion to find DeVogel in contempt for various alleged violations of the court's orders. We conclude that the court did not abuse its discretion.

"An attempt by a parent . . . to refuse to perform the duties provided in the parenting plan . . . shall be deemed bad faith and shall be punished by the court by holding the party in contempt of court." RCW 26.09.160(1). If the trial court finds that a parent "has not complied with the order establishing residential provisions for the child" in bad faith, "the court shall find the parent in contempt of court." RCW 26.09.160(2)(b).

"We review a trial court's decision in a contempt proceeding for an abuse of discretion." In re Marriage of Eklund, 143 Wn. App. 207, 212, 177 P.3d 189 (2008). We review factual findings for substantial evidence and do not review the court's credibility determinations. Id. "In reviewing contempt violations concerning parenting plans, we strictly construe the parenting plan to see whether the alleged conduct constitutes 'a plain violation' of the plan." Id. at 213 (quoting In re Marriage of Humphreys, 79 Wn. App. 596, 599, 903 P.2d 1012 (1995)).

1. Contact at Exchanges

Padilla alleges that DeVogel violated Section 12 of the parenting plan, which provides that the parents must remain in their vehicles during exchanges,

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

may not speak to each other at the exchanges, and must leave the exchange point after the children are with the other parent.

The first instance at issue occurred on October 25, 2020. Padilla's attorney had indicated to DeVogel's attorney that A.D. would be dropped off that evening, but Padilla only brought N.D. to the exchange. DeVogel stayed in his car but yelled, "where's [A.D.]?" to Padilla. The court found that this was not a willful violation of the order because there was a valid confusion on DeVogel's part when he reasonably expected A.D. to be at the exchange. Padilla contends that the court erred by finding that DeVogel had a reasonable expectation that A.D. would be at that exchange, but does not address the e-mail from her attorney anticipating that "[Padilla] will return both children to [DeVogel]" at the exchange. This is substantial evidence supporting the court's finding.

The second instance was the next morning. Brandon, instead of Padilla, brought A.D. to the exchange, and DeVogel got out of his car and had a conversation with Brandon. DeVogel explained that he was early and had gotten out of his car to get coffee before the exchange and then saw Brandon, 20 minutes before the exchange was scheduled to take place. The court found that this was not a violation of the order, because DeVogel got out of the car to get coffee before the exchange time and because the order did not prohibit DeVogel from speaking to Brandon. Padilla's only new argument is that the purpose of the order was "to keep the parties from interacting at child exchanges." But Brandon is not a party to the dissolution. Viewing the facts in the light most

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

favorable to DeVogel, the court did not abuse its discretion by declining to find DeVogel in contempt for these incidents.

### 2. Sharing of Health Information

Padilla next contends that DeVogel violated the portions of the parenting plan that permit both parents to request medical information from the children's providers and require the parents to inform the other parents about medical appointments beforehand. Padilla specifically alleges that DeVogel failed to inform her beforehand about one of A.D.'s routine dental appointments. Padilla claims that DeVogel admitted that he did not disclose the appointment, but DeVogel only said that the observation "was scheduled previously." The appointment took place less than two weeks after the entry of the modified parenting plan. It is not clear that DeVogel failed to comply with the order, let alone that he refused to do so. In re Marriage of Davisson, 131 Wn. App. 220, 226, 126 P.3d 76 (2006) (describing contempt of parenting plan as " 'refus[al] to comply' " and "intentional disobedience" (quoting In re Marriage of Rideout, 150 Wn.2d 337, 77 P.3d 1174 (2003))). The court did not abuse its discretion by finding that Padilla failed to meet her burden to establish contempt.

### 3. Harborview Appointment

Padilla next contends that DeVogel was in contempt of the court's order that A.D. would "be taken to her scheduled appointment at Harborview, accompanied by her stepmother, Leticia DeVogel and no one else." This order was entered after trial when Padilla brought an emergency motion for a

temporary custody order based on her concern that A.D. was being sexually assaulted. The court concluded that there was "minimal evidence supporting the belief" that A.D. was sexually abused, but it ordered that A.D. should still be taken to her appointment at the Harborview Center for Sexual Assault and Traumatic Stress because it was unclear whether Padilla or doctors had requested the appointment. Later, the DCYF social worker informed DeVogel that the appointment was canceled. The court found that DeVogel was not in willful violation for not ensuring A.D. went to the canceled appointment; DeVogel did not "take proactive steps to frustrate the process, and specifically frustrate the intent behind the court order." The cancellation of the appointment was "a reasonable excuse for noncompliance." In re Marriage of Myers, 123 Wn. App. 889, 893, 99 P.3d 398 (2004).

The court did not abuse its discretion by declining to find DeVogel in contempt of court.

Correction of Findings

Padilla next contends that the court erred by amending one of its findings. On DeVogel's motion, the court amended its finding that, "[o]f the 55 CPS referrals made, there was only one founded finding against the father" to read, "[o]f the 55 CPS referrals made, there originally was a founded finding against the father. [DSHS] reversed the founded finding to an unfounded finding." Padilla does not contend that this amendment is inaccurate, but instead contends

17

that the court was not permitted to make this amendment under CR 60(a) and RAP 7.2(e). We disagree.

CR 60(a) provides that "[c]lerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time." If review has been accepted by an appellate court, the mistakes "may be corrected pursuant to RAP 7.2(e)." CR 60(a). RAP 7.2(e) provides that after the appellate court accepts review, the trial court may "change or modify a decision that is subject to modification by the court that initially made the decision," but that "[i]f the trial court determination will change a decision then being reviewed by the appellate court, the permission of the appellate court must be obtained prior to the formal entry of the trial court decision."

Here, Padilla contends, without legal support, that this was not a clerical change under CR 60(a). But even if we agree that the court's amendment was not clerical, it corrects an "error[ ] . . . arising from oversight or omission," which is permitted under CR 60(a). Therefore, the court did not err under CR 60 by amending the order.

Moreover, the amendment was not error under RAP 7.2(e), which permits a trial court to enter revised findings that "do not affect the judgment in any substantive manner," and do "not require or entail the reception of additional evidence." Olsen Media v. Energy Scis., Inc., 32 Wn. App. 579, 588, 648 P.2d 493 (1982). Because the court's revision did not require additional evidence, did

not change the effect of any of its orders, and merely clarified an important detail

to be in line with the evidence at trial, we conclude that the court's amendment

did not change a decision being reviewed by the Court of Appeals under

RAP 7.2(e).

## Retention of Jurisdiction

Padilla assigns error to the court's decision to retain jurisdiction over the

case after rotating off the family law calendar.  But she presents no legal

argument that this is not permitted, and instead only alludes to unfairness in the

court's decisions as justifying remand to a different judge.

While litigants are guaranteed the right to an impartial judge, "[l]itigants

must submit proof of actual or perceived bias to support a claim of appearance of

impartiality."  In re Marriage of Rounds, 4 Wn. App. 2d 801, 808, 423 P.3d 895

(2018).  Padilla has not done so.  The court's findings recognize strengths and

weaknesses in both parents and do not indicate bias or partiality.[8]  We are

therefore not persuaded.

## Admissibility of Hearsay Statement

Padilla next challenges the court's exclusion as hearsay of a statement

A.D. made to her about being choked by N.D.  We again find no error.

The hearsay rule provides that "a statement, other than one made by the

declarant while testifying at the trial or hearing, offered in evidence to prove the

---

[8] Furthermore, if either party files a proceeding to modify, Padilla will be entitled to a new judge if she files an affidavit of prejudice.  Rounds, 4 Wn. App. 2d at 807.

truth of the matter asserted" is generally not admissible. ER 801(c); ER 802. However, under the "excited utterance" exception, "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is admissible. ER 803(a)(2). "[T]he proponent of excited utterance evidence must satisfy three 'closely connected requirements' that (1) a startling event or condition occurred, (2) the declarant made the statement while under the stress of excitement of the startling event or condition, and (3) the statement related to the startling event or condition." State v. Ohlson, 162 Wn.2d 1, 8, 168 P.3d 1273 (2007) (quoting State v. Woods, 143 Wn.2d 561, 23 P.3d 1046 (2001). We review a decision on the admission of a hearsay statement for abuse of discretion. Ohlson, 162 Wn.2d at 7.

Here, Padilla appears to contend that A.D.'s statement should have been admissible as an excited utterance. At trial, Padilla first introduced a report from A.D.'s school nurse that said, "After asking [A.D.] how everything was going at home, she replied with 'Good except my brother choked me last night because he was mad.' No marks or redness noted on student's neck. Left voicemail for Dad to follow up." Padilla then began to testify that during a phone call with A.D. a few hours after the incident, A.D. told Padilla about the incident. Padilla testified:

> She said, [N.D.] choked me—or "[N.D.] choked me today and my throat is sore, so I might not be able to talk for very long." And she was whispering. I don't really know why she was whispering.
>
> . . .
>
> [A.D.] had—[A.D.] had said that—okay. So my response to that was something like "Thank you for telling me." And then it was

20

No. 82091-5-I/21

quiet. And I think—I mean, I was in shock, right? And I—we're on the phone, so I said "Is there anything else that you want to share with me?" And she said, "Yeah, it made it feel like when she saw her dad do that to Brandon." And then she described when [N.D.] had his arm around her neck like that, and she said she couldn't breathe.

The court sustained DeVogel's hearsay objection to this testimony. Padilla contended that it should be admitted as an excited utterance but the court ultimately stated that the facts did not support this theory.

We conclude that the court did not abuse its discretion. "The crucial question with regard to excited utterances is whether the statement was made while the declarant was still under the influence of the event to the extent that his statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment." State v. Sellers, 39 Wn. App. 799, 804, 695 P.2d 1014 (1985) (emphasis omitted). Because A.D.'s statement was made a few hours after the incident, and given that A.D. was whispering, the court could reasonably conclude that A.D. was no longer under the stress or excitement of the incident.

Attorney Fees

Padilla requests attorney fees under RCW 26.09.140, which provides that the court may "in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees." "The decision to award fees under RCW 26.09.140 is discretionary and must be based upon a consideration that balances the needs of the spouse seeking fees against the ability of the other spouse to pay." In re Marriage of Moody, 137 Wn.2d 979, 994, 976 P.2d

21

1240 (1999). Padilla submitted an affidavit about her financial need describing her expenses, noting that her income was $23,764 in 2020 and that she lived on student loans in 2021. While she describes her expenses in detail, she does not clarify what her current income is or what her employment status or prospects are. Because she has provided insufficient information for this court "to adequately consider present need," and because DeVogel does not appear to have an ability to pay, we deny Padilla's request. Id.

We affirm in part but remand for the court to strike Padilla's portion of the $500 reunification counseling bill and corresponding interest from her child support obligation.

Smith, A.C.J.

WE CONCUR:

Andrus, C.J.