[No. 23560-9-II. Division Two. January 19, 2001.]

THE STATE OF WASHINGTON, *Respondent*, v. ROY WAYNE RUSSELL, JR., *Appellant*.

424

*Roy Wayne Russell, Jr.*, Pro se.

*Suzan L. Clark*, for appellant (appointed counsel for appeal).

*Arthur D. Curtis, Prosecuting Attorney*, and *Michael C. Kinnie, Deputy*, for respondent.

MORGAN, J. — Roy Russell appeals a conviction for first degree arson and a sentence of life without the possibility of parole. Attacking his conviction, he claims that he was impeached with certain prior convictions in violation of ER 609(b). Attacking his sentence, he claims that he was improperly classified as a persistent offender. For the reasons that follow, we affirm the conviction, vacate the sentence, and remand for resentencing.

Roy Russell dated Elizabeth Alsteen from 1993 to 1997. He lived at her apartment off and on, but was not living there at the time of the events giving rise to this case. Alsteen's neighbors included Shane Core and Shirley Twombly.

On July 1, 1997, Russell was visiting at Alsteen's apartment. He became upset because Core had assembled a bed for her. She called the police and asked Russell not to contact her again.

Between July 1 and July 8, Russell called Alsteen several

times. He also drove his car in the vicinity of her apartment. She obtained a restraining order but did not have it served. She repeatedly asked the police to intercede.

During the evening of July 8, Alsteen and Core were at the Halftime Tavern, a neighborhood establishment perhaps six or seven minutes by car from their apartments. Russell came in, wearing a "dusty rose" long-sleeved shirt and tan pants. When Alsteen asked him to leave her alone, he grabbed her and said, "Why are you doing this to me? No matter where you are, I'm going to be watching you[.]"[1] Bouncers subdued him with pepper spray.

During this altercation, someone called 911. The call was received at 7:49 P.M., and officers arrived at the tavern at 7:54 P.M. Alsteen and Core were still there, but Russell had gone. Alsteen and Core remained at the tavern for another hour or so.

About 8:00 P.M., Twombly saw Russell go up the stairs to Alsteen's apartment. She had seen him four or five times before, and she recognized him as Alsteen's ex-boyfriend. He was wearing a "long-sleeved," "dark pinkish shirt and brown or tan slacks."[2] A minute or two later, she heard a loud "bang" and saw him leave. A minute or two after that, she saw smoke "billowing" from the apartment. She immediately called 911—the time was now 8:11 P.M.—and it immediately dispatched emergency personnel. Fire fighters arrived to find the apartment's front door open and its interior in flames.

Officer McNicholas was the first police officer at the scene. He spoke with Twombly, who seemed excited and upset. She related that she had seen Alsteen's ex-boyfriend "go up the stairs, heard a bang noise, a crashing noise, saw the subject then come down the stairs shortly thereafter, and then she noticed smoke almost immediately[.]"[3] She

---

[1] 10 Report of Proceedings at 92.

[2] 11A Report of Proceedings at 137.

[3] 11A Report of Proceedings at 93.

also described the boyfriend as wearing a "pinkish shirt . . . and tan pants."[4]

Before 9:00 P.M., an associate of Russell's, Brad Anderson, saw Russell walking along the street near Russell's residence. He offered Russell a ride, and Russell got in. As they drove, Russell related that he "went to [Alsteen's] apartment and lit something on fire—well, he ran up the stairs, kicked the door in, lit something on fire and left it on the couch."[5] Anderson suggested that Russell turn himself in, and they drove to a police station.

On July 11, 1997, the State charged Russell with arson in the first degree. It also alleged that Russell was a persistent offender, and thus subject to a sentence of life without possibility of parole.[6]

On October 15, 1997, the State gave notice that if Russell testified as a witness at trial, it would seek to impeach him with three prior convictions. It listed those convictions as follows:

1. Robbery, a Class 4 Felony. Pima County, Arizona. Sentencing date 6/6/80 (offense date 5/22/79).
2. Theft, a Class 3 Felony. Pima County, Arizona. Sentencing date 11/5/82 (offense date 5/10/82).
3. Attempted Perjury, a Class 5 Felony. Pima County, Arizona. Sentencing date 9/27/84 (offense date 9/14/83).[7]

On March 16, 1998, the trial court heard argument on Russell's motion in limine to bar the State's proposed use of his convictions. The colloquy between court and prosecutor was as follows:

[PROSECUTOR]: The State anticipates that if the defendant were to testify, Your Honor, we would bring in certified copies of the prior convictions if

---

[4] *Id.*

[5] *Id.* at 34.

[6] RCW 9.94A.120(4).

[7] Clerk's Papers at 31.

he denies the convictions, or if he admits the convictions, I would just go with that.

COURT: And those convictions are?

. . . .

[PROSECUTOR]: Specifically a robbery Class 4 felony from Pima County, Arizona. The sentencing date was 6-6 of 1980; offense date was 5-22 of 1979.

Originally started out as an armed robbery. Doesn't indicate what—just that indicated robbery, Class 4 felony, is the conviction.

Second one is a theft, which is a Class 3 felony out of Pima County, Arizona. The sentencing date was November 5 of 1982; the offense date was May 10th of 1982. They just indicate that it's a felony conviction for theft.

The third conviction that we would impeach with is attempted perjury, which is a Class 5 felony in Pima County, Arizona. Sentencing date was September 27 of 1984. The offense date was September 14th of 1983. "I served two years of prison for attempted perjury."

The other conviction deals with kidnapping. I would not anticipate getting into that[.]

. . . .

COURT: Well, let me ask you, Mr. [Prosecutor] . . . are you indicating that you wish these admitted under 6.09 [sic]?

. . . .

[PROSECUTOR]: For impeachment if he takes the stand, Your Honor, crimes of moral turpitude and dishonesty.

COURT: And the concern as relates to the ten years?

[PROSECUTOR]: That's why we filed the notice, Your Honor.

COURT: Kidnapping will not be allowed. Robbery, theft and perjury if the defendant takes the stand will in fact be allowed.[8]

Thus, the trial court admitted the offered convictions without balancing probative value against unfair prejudice.

On May 19, 1998, Russell asked the trial court to reconsider the admissibility of his prior convictions. He supported his request with a written memorandum that cited and discussed ER 609(b). The trial court declined to revisit the matter until trial.

On the first morning of trial, June 1, 1998, Russell again asked the trial court to reconsider the admissibility of his prior convictions. The trial court adhered to its earlier ruling.

During trial, the State's witnesses testified essentially as described above. Russell testified that he and Alsteen had lived together, but that they were not living together in early July 1997. He acknowledged that Shirley Twombly "lived in the apartment below" Alsteen's, and that for the year or so he had lived with Alsteen, he had seen Twombly "maybe once or twice a week when I'd get off work[.]"[9] He said that around July 1, he became angry at Alsteen because of Core. After that, "[t]hings got outta hand"; "I kept interfering when I shouldn't have interfered"; and "9-1-1 has been called on me numerous times."[10] During the late afternoon of July 8, he had "a few drinks, about three beers" at a bar called Bob's.[11] On his way home, he saw Alsteen's truck outside the Halftime. He went in, contacted her, and an altercation ensued. Bouncers took him outside and sprayed him with Mace. He became angry and stated,

---

[8] 8 Report of Proceedings at 85-89. When the court and prosecutor spoke of a kidnapping, they were referring to a 1982 Arizona conviction that was later used at sentencing.

[9] 13A Report of Proceedings at 80.

[10] *Id.* at 55-56.

[11] *Id.* at 57.

"I am gonna get even with all of you."[12] Aware that the police had been called, he went to his business and took a shower, which lasted for "probably a good thirty minutes[.]"[13] After dressing—in clothes different from those he had worn at the Halftime—he walked to a nearby bowling alley, but left again when he heard the police asking for him. He was walking back to his business when Anderson stopped and picked him up. He and Anderson agreed he should turn himself in for the altercation at the Halftime, but not for any arson. Indeed, he was unaware of any arson, and he never told Anderson that he had set fire to Alsteen's apartment. On cross-examination, he was impeached with the three convictions listed above. The jury convicted.

At sentencing, the State showed that Russell had a 1980 Arizona conviction for robbery and a 1982 conviction for kidnapping. It argued that the robbery was his first "strike"; the kidnapping his second; the current arson his third; and thus that he was subject to a sentence of life without possibility of parole under the Persistent Offender Accountability Act (commonly referred to as the "three strikes" law). Russell did not challenge the kidnapping, but he did challenge the robbery. Overruling his challenge, the trial court found he was a persistent offender and imposed a sentence of life without possibility of parole.

I

Russell argues in his pro se brief that the trial court erred by not balancing probative value against unfair prejudice before it admitted, for impeachment purposes, his 1980 robbery conviction, his 1982 theft conviction, and his 1984 attempted perjury conviction. We consider (a) whether the trial court erred and (b) whether the error was harmless.

A

ER 609 governs the impeachment use of convictions. It provides in part:

---

[12] *Id.* at 59.

[13] *Id.* at 61.

**(a) General Rule**. For the purpose of attacking the credibility of a witness in a criminal or civil case, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during examination of the witness but only if the crime (1) was punishable by death or imprisonment in excess of 1 year under the law under which the witness was convicted, and the court determines that the probative value of admitting this evidence outweighs the prejudice to the party against whom the evidence is offered, or (2) involved dishonesty or false statement, regardless of the punishment.

**(b) Time Limit**. Evidence of a conviction under this rule is not admissible if a period of more than 10 years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.[14]

■ Our first task is to ascertain whether ER 609(a) or ER 609(b) applies in this case. ER 609(a) controls the admissibility of a conviction not more than 10 years old. ER 609(b) controls the admissibility of a conviction more than 10 years old. The 10-year period is judged separately for each conviction.[15] The 10-year period starts at conviction or "release from confinement for that conviction," whichever is later. The 10-year period ends when the conviction is admitted at trial. While the evidence in this case showed that each offered conviction was more than 10 years old, it did not show that Russell was confined on any of the three

---

[14] ER 609(b) goes on with a second sentence that is not in issue here. That sentence provides, "However, evidence of a conviction more than 10 years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence."

[15] Washington's ER 609(b) is copied verbatim from Fed. R. Evid. (FRE) 609(b). As originally proposed by the Advisory Committee to the United States Supreme Court, FRE 609(b) would have admitted all convictions if a witness had had any convictions in the 10 years preceding trial, but no convictions if the witness had been free of convictions in the 10 years preceding trial. 56 F.R.D. 183, 269-70. Congress expressly rejected this all-or-nothing approach in favor of the conviction-by-conviction approach that now appears on the face of the rule.

after 1986.[16] The trial having been in 1998, ER 609(b) applies.

▮▮▮ Our next tasks are to ascertain whether ER 609(b) required the trial court to balance probative value against unfair prejudice, and whether ER 609(b) required such balancing to be performed on the record. ER 609(b) provides on its face that a trial court shall not admit *any* conviction more than 10 years old "unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect." ER 609(b) was copied verbatim from Federal Rule of Evidence (FRE) 609(b), and the drafters of FRE 609(b) commented that the trial court shall "make specific findings *on the record* as to the particular facts and circumstances it has considered in determining that the probative value of the conviction substantially outweighs its prejudicial impact."[17] The Washington Supreme Court has mandated on-the-record balancing under ER 404(b)[18] and ER 609(a),[19] and as a matter of both logic and consistency, the same mandate should apply to ER 609(b). Accordingly, we hold that ER 609(b) required the trial court to balance probative value against unfair prejudice, and that ER 609(b) required the trial court to balance on the record.

The State argues that the trial court was not required to balance, on the record or otherwise, because Russell's

---

[16] The only evidence produced at trial is transcribed at 13A Report of Proceedings at 83. A "penitentiary packet" that was first produced at sentencing shows that Russell may not have been released from confinement on the theft conviction until 1987. Resp't's Supplementation of Record at 5; Former ARIZ. REV. STAT § 13-708 (1978 ARIZ. SESS. LAWS, ch. 201, §§ 104, 108). Even if that packet be considered here—it was not before the trial court when the trial court made the decision under discussion—it would not alter the applicability of ER 609(b). Assuming that Russell was released in 1987, the trial of this case was more than 10 years later.

[17] S. REP. No. 1277, at 15 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7051, 7061. *See also State v. Jackson*, 102 Wn.2d 689, 694, 689 P.2d 76 (1984) (court must balance on the record when applying ER 404(b)); *State v. Jones*, 101 Wn.2d 113, 122, 677 P.2d 131 (1984) (court must balance on the record when applying ER 609(a)(1)), *overruled on other grounds by State v. Brown*, 111 Wn.2d 124, 761 P.2d 588 (1988).

[18] *Jackson*, 102 Wn.2d at 694.

[19] *Jones*, 101 Wn.2d at 122.

convictions were for crimes of dishonesty or false statement.[20] The State fails to distinguish, however, between the conviction that is more than 10 years old and the conviction that is not more than 10 years old. A trial court is neither permitted nor required to balance when a conviction that involves dishonesty or false statement is not more than 10 years old.[21] A trial court is *always* required to balance on the record when a conviction is more than 10 years old, regardless of whether the conviction involves dishonesty or false statement.[22] We conclude that the trial court was required to balance on the record; that it failed to do so; and that its failure was error.

## B

The remaining question is whether the error was harmful or harmless. Being merely evidential, and not constitutional, it was harmless if, "within reasonable probabilities," it did not affect the outcome of the trial.[23]

When applying this test, an appellate court does not always take the same approach. Under one approach, it asks whether the trial court would have admitted if the trial court had properly balanced on the record; to say yes is also to say that the erroneous failure to balance could not have affected the outcome of the trial.[24] Under another

---

[20] We agree that Russell's convictions were for crimes of dishonesty or false statement under Washington law. *See, e.g., State v. Hardy*, 133 Wn.2d 701, 707, 946 P.2d 1175 (1997) (perjury is a crime of dishonesty); *State v. Rivers*, 129 Wn.2d 697, 705, 921 P.2d 495 (1996) (robbery is a crime of dishonesty); *State v. Ray*, 116 Wn.2d 531, 545, 806 P.2d 1220 (1991) (theft is a crime of dishonesty).

[21] ER 609(a)(2); *State v. Brown*, 113 Wn.2d 520, 547, 782 P.2d 1013, 787 P.2d 906 (1989); *State v. Newton*, 109 Wn.2d 69, 79, 743 P.2d 254 (1987); *State v. Watkins*, 61 Wn. App. 552, 556, 811 P.2d 953 (1991).

[22] ER 609(b).

[23] *State v. Calegar*, 133 Wn.2d 718, 727, 947 P.2d 235 (1997); *Ray*, 116 Wn.2d at 546; *Jackson*, 102 Wn.2d at 695.

[24] *State v. Barragan*, 102 Wn. App. 754, 759, 9 P.3d 942 (2000) (ER 404(b)); *State v. Binkin*, 79 Wn. App. 284, 291, 902 P.2d 673 (1995) (ER 404(b)), *review denied*, 128 Wn.2d 1015 (1996); *State v. Stanton*, 68 Wn. App. 855, 864-66, 845 P.2d 1365 (1993) (ER 404(b)); *State v. Donald*, 68 Wn. App. 543, 547, 844 P.2d 447 (ER

approach, the appellate court assumes or determines that the trial court would not have admitted if the trial court had properly balanced; then, in light of all the evidence, it asks whether the conviction affected the outcome "within reasonable probabilities."[25] We examine both approaches here.

1

To use the first approach, an appellate court must understand the finding that a trial court must make before admitting a conviction that is more than 10 years old. Preliminarily then, we consider the nature of that finding.

By its terms, ER 609(b) requires a finding that probative value outweighs unfair prejudice not just slightly, but *substantially*.[26] In contrast, ER 403 requires a finding that probative value is not substantially outweighed by unfair

---

404(b)), *review denied*, 121 Wn.2d 1024 (1993); *State v. McGhee*, 57 Wn. App. 457, 460, 788 P.2d 603 (ER 404(b)), *review denied*, 115 Wn.2d 1013 (1990); *State v. Bradford*, 56 Wn. App. 464, 468-69, 783 P.2d 1133 (1989) (ER 404(b)); *State v. Mutchler*, 53 Wn. App. 898, 903, 771 P.2d 1168 (ER 404(b)), *review denied*, 113 Wn.2d 1002 (1989); *State v. Bond*, 52 Wn. App. 326, 333, 759 P.2d 1220 (1988) (ER 609(a)(1)); *State v. Gogolin*, 45 Wn. App. 640, 645-46, 727 P.2d 683 (1986) (ER 404(b)); *State v. Mahmood*, 45 Wn. App. 200, 212, 724 P.2d 1021 (ER 404(b)), *review denied*, 107 Wn.2d 1002 (1986).

[25] *Rivers*, 129 Wn.2d at 706 (ER 609(a)(1)); *State v. Halstien*, 122 Wn.2d 109, 127, 857 P.2d 270 (1993) (ER 404(b)); *Jackson*, 102 Wn.2d at 696 (ER 404(b)); *Jones*, 101 Wn.2d at 125-26 (ER 609(a)(1)); *State v. Carleton*, 82 Wn. App. 680, 686-87, 919 P.2d 128 (1996) (ER 404(b)); *State v. Roche*, 75 Wn. App. 500, 509, 878 P.2d 497 (1994) (ER 609(a)(1)); *State v. Sinclair*, 46 Wn. App. 433, 440, 730 P.2d 742 (1986) (ER 609(a)(1)), *review denied*, 108 Wn.2d 1006 (1987); *State v. Evans*, 45 Wn. App. 678, 683-85, 726 P.2d 1027 (1986) (ER 609(a)(1)), *review denied*, 107 Wn.2d 1025 (1987); *State v. Thamert*, 45 Wn. App. 143, 151-52, 723 P.2d 1204 (ER 404(b)), *review denied*, 107 Wn.2d 1014 (1986); *State v. Traweek*, 43 Wn. App. 99, 106, 715 P.2d 1148 (1986) (ER 404(b)), *overruled on other grounds by State v. Blair*, 117 Wn.2d 479 (1991); *State v. Monk*, 42 Wn. App. 320, 324, 711 P.2d 365 (1985) (ER 404(b)); *State v. Thomas*, 35 Wn. App. 598, 609, 668 P.2d 1294 (1983) (ER 404(b)).

[26] This finding is made by the trial judge at a hearing convened under ER 104(a). Presumably, the "specific facts and circumstances" required to support it are shown at that hearing also. For facts that can be shown to the jury, see *Newton*, 109 Wn.2d at 81. Parenthetically but interestingly, the same finding is required by a new amendment to FRE 703. Effective in the federal courts on December 1, 2000, the new amendment has not yet been considered in Washington.

prejudice, and ER 609(a)(1) requires a finding that probative value outweighs unfair prejudice only slightly. ER 609(b) is biased toward exclusion more strongly than either ER 403 or ER 609(a).

This bias was intentionally created. ER 609(b) is patterned after FRE 609(b). After initially being proposed by an Advisory Committee to the United States Supreme Court, FRE 609(b) was forwarded to Congress, where it was revised several times. The House Committee on the Judiciary took "the view that after ten years . . . the probative value of the conviction with respect to that person's credibility [has] diminished to a point where it should no longer be admissible." Thus, the House suggested "that upon the expiration of ten years from the date of a conviction of a witness, or of his release from confinement for that offense, that conviction may no longer be used for impeachment."[27] The Senate generally agreed, but it wanted to accommodate "exceptional circumstances." Its Committee on the Judiciary explained:

> Although convictions over ten years old generally do not have much probative value, there may be exceptional circumstances under which the conviction substantially bears on the credibility of the witness. Rather than exclude all convictions over 10 years old, the committee adopted an amendment in the form of a final clause to the section granting the court discretion to admit convictions over 10 years old, but only upon a determination by the court that the probative value of the convictions *supported by specific facts and circumstances*, substantially outweighs its prejudicial effect.
>
> It is intended that convictions over 10 years old will be admitted very rarely and only in exceptional circumstances. *The rules provide that the decision be supported by specific facts and circumstances thus requiring the court to make specific findings on the record as to the particular facts and circumstances it has considered in determining that the probative*

---

[27] H.R. REP. No. 650, at 11 (1973), *reprinted in* 1974 U.S.C.C.A.N. 7075, 7085.

*value of the conviction substantially outweighs its prejudicial impact.*[28]

After acceptance by a conference committee, the Senate's version became both the first sentence of FRE 609(b) and the genesis of ER 609(b).

ER 609(b)'s bias cannot be overcome merely by showing that a conviction is for dishonesty or false statement. While such a showing automatically satisfies ER 609(a), which requires a finding that probative value *slightly* outweighs unfair prejudice,[29] such a showing does not satisfy ER 609(b), which requires a finding, "supported by specific facts and circumstances," that probative value *substantially* outweighs unfair prejudice. As the Fourth Circuit has said:

> Rule 609(b) "made it crystalline that the District Court was only to depart from the prohibition against the use for impeachment purposes of convictions more than ten years old 'very rarely and only in exceptional circumstances.'" . . . [T]he Rule requires the district court before admitting evidence of a conviction to find that the probative value of the conviction "substantially" outweighs its prejudicial effect, and the district court is *required* to support its findings with "specific facts and circumstances." It follows that when the government seeks to use evidence of a conviction more than ten years old for purposes of impeachment, it bears the burden of establishing specific, or articulated, facts and circumstances that support the probative value of the conviction such that it substantially outweighs its prejudicial impact.
>
> Here . . . the district court not only failed to make any express finding that the probative value *substantially* outweighed the prejudicial effect of the evidence, but the record is silent both as to any specific facts supporting the probative value of the conviction for impeachment purposes, or showing how its probative value substantially outweighs its prejudicial effect. The district court supported its ruling with case law, not with facts, and at best can only be said to have found implicitly that the probative value of the evidence outweighed the prejudice, an insufficient finding under Rule 609(b). . . . [T]his stringent

---

[28] S. Rep. No. 1277, at 15 (1974) (emphasis added), *reprinted in* 1974 U.S.C.C.A.N. 7051, 7061-62.

[29] *Newton*, 109 Wn.2d at 79; *compare* ER 609(a)(1) and (a)(2).

standard for district court findings under the Rule is necessary because the congressional purpose was to prohibit the admission of convictions more than ten years old, permitting exceptions to the prohibition "very rarely."[30]

The record in this case shows only that each of Russell's convictions was more than 10 years old, and that each was for a crime of dishonesty or false statement. The record is devoid of any "specific facts or circumstances" from which to conclude that these convictions possessed probative value that *substantially* outweighed unfair prejudice despite their age. Accordingly, we cannot say that the trial court would properly have admitted them if it had properly balanced on the record.

### 2

█ Turning to the second approach, we assume that the three convictions were improperly admitted. Then, we inquire whether they affected the verdict "within reasonable probabilities." At the core of this inquiry is the strength of the other evidence.

Russell lived with Alsteen for a year or so at her apartment. He was not living with her in July 1997. On July 1, he became angry with her because of Core. The police were called, and "there were problems."[31] On the evening of July 8, after having "a few drinks" elsewhere, he entered the Halftime while wearing a pink shirt and tan pants. He spoke with Alsteen, and an altercation ensued. Bouncers sprayed him with Mace, and he was angry when he left. He left after 7:49 P.M., when 911 was called, but before 7:54 P.M., when the police arrived. The Halftime is six or seven minutes from Alsteen's apartment, and around 8:00 P.M.,

---

[30] *United States v. Beahm*, 664 F.2d 414, 417-18 (4th Cir. 1981) (footnote and citations omitted) (quoting *United States v. Cavender*, 578 F.2d 528 (4th Cir. 1978)); *see also State v. Colf*, 337 S.C. 622, 525 S.E.2d 246, 249 (2000) ("Whether the probative value of the evidence substantially outweighs that prejudice is a determination the trial court should make after carefully balancing the interests involved and articulating for the record the specific facts and circumstances supporting its decision.").

[31] 13A Report of Proceedings at 55.

Twombly saw a man wearing a pink shirt and tan or brown pants go up the stairs to Alsteen's apartment. She recognized that man as Russell, whom she knew by sight because he had lived in the apartment above hers for about a year. Before 8:11 P.M., when she called 911, she saw Russell leave, and she saw that Alsteen's apartment was on fire. When fire fighters arrived, they found no one home, the front door open, and the apartment burning. It is our view that this evidence is virtually airtight, and that with or without Russell's prior convictions, *any* jury would have rejected his claim that he was taking a 30-minute shower at the crucial time. Accordingly, it is also our view that the error in admitting the prior convictions did not affect the outcome of the trial within reasonable probabilities, and that the error was harmless in light of the other evidence.[32]

## II

Russell argues that the trial court erred by classifying him as a persistent offender. Under former RCW 9.94A.030-(27)(a),[33] a "persistent offender" is one who:

(i) Has been convicted in this state of any felony considered a most serious offense; and

(ii) Has, before the commission of the offense under (a) of this subsection, been convicted as an offender on at least two separate occasions, whether in this state or elsewhere, of felonies that under the laws of this state would be considered most serious offenses and would be included in the offender score under RCW 9.94A.360; provided that of the two or more previous convictions, at least one conviction must have occurred before the commission of any of the other most serious offenses for which the offender was previously convicted[.]

---

[32] We emphasize that this conclusion results from the highly unusual strength of the evidence presented here. In most instances, we would deem the improper admission of convictions for robbery, theft, and attempted perjury to be highly prejudicial.

[33] LAWS OF 1997, ch. 338, § 2 (effective July 1, 1997). Currently, the definition of "persistent offender" can be found at RCW 9.94A.030(29). Effective July 1, 2001, the definition of "persistent offender" can be found at RCW 9.94A.030(31).

Russell does not deny that his current offense is a "most serious" one,[34] but he claims that he does not have two prior "strikes." The State responds that he has one strike by virtue of a 1980 Arizona robbery conviction, and a second strike by virtue of a 1982 Arizona kidnap conviction. We describe the framework for analysis before applying that framework to each conviction.

## A

■ Washington courts use a three-step analysis when determining the Washington sentencing consequences of an out-of-state conviction. The first step is to convert the out-of-state crime into its Washington counterpart.[35] The second step is to determine the relevant sentencing consequences of the Washington counterpart.[36] The third step is to assign those same sentencing consequences to the out-of-state conviction,[37] thus "treat[ing] a person convicted outside the state as if he or she had been convicted in Washington."[38]

---

[34] Former RCW 9.94A.030(23) (LAWS OF 1997, ch. 338, § 2 (effective July 1, 1997)). It defined a "most serious offense" to include:

(a) Any felony defined under any law as a class A felony[;]

. . .

(i) Kidnapping in the second degree;

. . .

(o) Robbery in the second degree[.]

The current definition of "most serious offense" is found at RCW 9.94A.030(25). Effective July 1, 2001, the definition of "most serious offense" will be found at RCW 9.94A.030(27).

[35] RCW 9.94A.360(3); *State v. Berry*, 141 Wn.2d 121, 131, 5 P.3d 658 (2000); *State v. Wiley*, 124 Wn.2d 679, 683, 880 P.2d 983 (1994); *State v. Cameron*, 80 Wn. App. 374, 378, 909 P.2d 309 (1996); *State v. Weiand*, 66 Wn. App. 29, 31, 831 P.2d 749 (1992).

[36] *Berry*, 141 Wn.2d at 131 ("If comparable offenses are found, the court decides which is the *most* comparable offense and determines its classification under Washington law."); *Cameron*, 80 Wn. App. at 378; *Weiand*, 66 Wn. App. at 32.

[37] *Berry*, 141 Wn.2d at 131; *Cameron*, 80 Wn. App. at 378-79; *Weiand*, 66 Wn. App. at 32.

[38] *Berry*, 141 Wn.2d at 131 (quoting *Cameron*, 80 Wn. App. at 378); *Weiand*, 66 Wn. App. at 34.

The first step ensures that the out-of-state court necessarily found each element of the proposed Washington counterpart. If the record does not show that the out-of-state court found each element of the counterpart, the record also will not show that the defendant would have been convicted of the counterpart if prosecuted in this state. Thus, a different counterpart must be sought.

The first step is performed by comparing (a) the elements of the out-of-state crime as they existed on the date of the offense with (b) the elements of the proposed Washington counterpart crime as they existed on the date of the offense.[39] If the comparison reveals that the out-of-state crime contained each element of the Washington crime as of the date of the offense, it also reveals that the out-of-state court necessarily found each fact necessary to liability for the Washington crime; thus, "the foreign conviction . . . counts . . . as if it were the equivalent Washington offense."[40] If the comparison reveals that the out-of-state crime did not contain one or more elements of the Washington crime as of the date of the offense, it also reveals that the out-of-state court did not necessarily find each fact essential to liability for the proposed Washington counter-

---

[39] *Berry*, 141 Wn.2d at 131 ("The first step . . . is to identify any comparable Washington offenses by comparing the *elements* of the out-of-state crime with the *elements* of the potentially comparable Washington crimes."); *State v. Ford*, 137 Wn.2d 472, 479, 973 P.2d 452 (1999) ("To properly classify an out-of-state conviction according to Washington law, the sentencing court must compare the elements of the out-of-state offense with the elements of potentially comparable Washington crimes."); *State v. Morley*, 134 Wn.2d 588, 605-06, 952 P.2d 167 (1998) ("To determine if a foreign crime is comparable to a Washington offense, the court must first look to the elements of the crime. More specifically, the elements of the out-of-state crime must be compared to the elements of Washington criminal statutes in effect when the foreign crime was committed." (citations omitted)); *State v. Mutch*, 87 Wn. App. 433, 436-37, 942 P.2d 1018 (1997) ("To determine whether a foreign conviction counts toward an offender score, the sentencing court first compares the elements of the crime in the out-of-state statute to those comparable Washington statutes in effect when the crime was committed."), *review denied*, 134 Wn.2d 1016 (1998); *Cameron*, 80 Wn. App. at 379 ("To identify the comparable Washington offense, we compare the elements of the out-of-state crime with the elements of potentially comparable Washington crimes, as defined on the date the out-of-state crime was committed.").

[40] *Morley*, 134 Wn.2d at 606.

part crime; without more then, the out-of-state conviction cannot count as that Washington crime.[41] If the comparison reveals that the out-of-state crime contained all elements of the proposed Washington counterpart crime, but that one or more of those elements might not have been proved because the out-of-state crime also contained alternative elements, the comparison may not reveal whether the out-of-state court found each fact necessary to liability for the Washington crime, and it may be necessary to determine from the out-of-state record—e.g., the charge or the jury instructions—whether the out-of-state court found each fact necessary to liability for the Washington crime.[42] We hasten to add, however, an examination of the evidence before the out-of-state court is not enough without more; in the absence of a *finding* based on such evidence, there is no way to know whether the out-of-state court found the evidence to be reliable beyond a reasonable doubt.[43] In all circum-

---

[41] *See Ford*, 137 Wn.2d at 479 ("If the elements are not identical, . . . it may be necessary to look into the record of the out-of-state conviction to determine whether the defendant's conduct would have violated the comparable Washington offense."); *Morley*, 134 Wn.2d at 606 ("While it may be necessary to look into the record of a foreign conviction to determine its comparability to a Washington offense, the elements of the charged crime must remain the cornerstone of the comparison. Facts or allegations contained in the record, if not directly related to the elements of the charged crime, may not have been sufficiently proven in the trial.").

[42] *Morley*, 134 Wn.2d at 606 ("[I]f the foreign statute is broader than the Washington definition of the particular crime, 'the sentencing court may look at the defendant's conduct, as evidenced by the indictment or information, to determine whether the conduct would have violated the comparable Washington statute.' ") (quoting *Mutch*, 87 Wn. App. at 437); *Mutch*, 87 Wn. App. at 437 ("If the elements are the same, the prior conviction is included in the offender score. If they are not, or the foreign statute is broader than Washington's, the sentencing court may look at the defendant's conduct, as evidenced by the indictment or information, to determine whether the conduct would have violated the comparable Washington statute."); *State v. Duke*, 77 Wn. App. 532, 535, 892 P.2d 120 (1995) (Washington court "may look at the facts alleged in the indictment or information to determine the comparable Washington offense.").

[43] *Morley*, 134 Wn.2d at 606 ("While it may be necessary to look into the record of a foreign conviction to determine its comparability to a Washington offense, the elements of the charged crime must remain the cornerstone of the comparison. Facts or allegations contained in the record, if not directly related to the elements of the charged crime, may not have been sufficiently proven in the trial."); *see also Morley*, 134 Wn.2d at 606 ("[I]f the foreign statute is broader than the Washington definition of the particular crime, 'the sentencing court may look at the defen-

stances, the effort is to ensure that the out-of-state court found each element of the Washington counterpart crime, just as a Washington court would have if the defendant had been prosecuted here.

The second step involves ascertaining whether the Washington counterpart is a Class A, B, or C felony, or a gross misdemeanor or simple misdemeanor. As here, it may also involve whether the counterpart is a most serious offense, and whether the counterpart has washed out or is presently includable in the offender score.

The third step is simply to assign the counterpart's sentencing consequences to the out-of-state conviction. The end result, as already indicated, should be "to treat a person convicted outside the state as if he or she had been convicted in Washington."[44]

B

We now apply this analysis to Russell's 1980 Arizona conviction for "Robbery, a Class 4 felony."[45] To do that, we ask three questions: (1) To what Washington crime was Arizona's Class 4 robbery comparable in 1980? (2) Is that Washington crime a most serious offense? (3) Would a 1980 conviction for that Washington crime be presently includable in Russell's offender score?

---

dant's conduct, *as evidenced by the indictment or information*, to determine whether the conduct would have violated the comparable Washington statute.' ") (emphasis added) (quoting *Mutch*, 87 Wn. App. at 437); *Mutch*, 87 Wn. App. at 437 ("If the elements are the same, the prior conviction is included in the offender score. If they are not, or the foreign statute is broader than Washington's, the sentencing court may look at the defendant's conduct, *as evidenced by the indictment or information*, to determine whether the conduct would have violated the comparable Washington statute.") (emphasis added); *cf. Ford*, 137 Wn.2d at 479 ("If the elements are not identical, . . . it may be necessary to look into the record of the out-of-state conviction to determine whether the defendant's conduct would have violated the comparable Washington offense.").

[44] *Berry*, 141 Wn.2d at 131 (quoting *Cameron*, 80 Wn. App. at 378); *Weiand*, 66 Wn. App. at 34.

[45] Clerk's Papers at 253.

1

■ In 1980, Arizona had three degrees of robbery. *Arizona Revised Statutes* § 13-1902 provided that "[a] person commits robbery," a class 4 felony, "if in the course of taking any property of another from his person or immediate presence and against his will, such person threatens or uses force against any person with intent either to coerce surrender of property or to prevent resistance to such person taking or retaining property."[46] *Arizona Revised Statutes* § 13-1903 provided that "[a] person commits aggravated robbery," a class 3 felony, "if in the course of committing robbery as defined in § 13-1902, such person is aided by one or more accomplices actually present."[47] Former *Arizona Revised Statutes* § 13-1904 (amended 1983) provided that "[a] person commits armed robbery," a class 2 felony, "if, in the course of committing robbery as defined in § 13-1902, such person or an accomplice: (1) [i]s armed with a deadly weapon; or (2) [u]ses or threatens to use a deadly weapon or dangerous instrument."[48] For all three degrees of robbery, Arizona case law required that the defendant act with intent to steal.[49]

In 1980, Washington had two degrees of robbery. RCW 9A.56.190 defined "robbery" as follows:

> A person commits robbery when he unlawfully takes personal property from the person of another or in his presence against his will by the use or threatened use of immediate force, violence, or fear of injury to that person or his property or the person or property of anyone. Such force or fear must be used to obtain or retain possession of the property, or to prevent or

---

[46] 1977 ARIZ. SESS. LAWS, ch. 142, § 73, effective Oct. 1, 1978.

[47] 1977 ARIZ. SESS. LAWS, ch. 142, § 73, effective Oct. 1, 1978.

[48] 1977 ARIZ. SESS. LAWS, ch. 142, § 73, effective Oct. 1, 1978. Subsections (1) and (2) were amended in 1983 to add, after the words "deadly weapon" and "dangerous instrument," the words "or a simulated deadly weapon." 1983 ARIZ. SESS. LAWS, ch. 129, § 1. The amendments are not pertinent here.

[49] *State v. Lopez*, 158 Ariz. 258, 762 P.2d 545, 550 (1988) (element of robbery is " 'intent to deprive [victims] of their property' ") (quoting *State v. Wallace*, 151 Ariz. 362, 728 P.2d 232, 235 (1986)); *State v. Yarbrough*, 131 Ariz. 70, 638 P.2d 737, 739-40 (1981) (robbery includes a taking, and "taking . . . includes an exercise of control over property as contemplated by the definition of theft").

overcome resistance to the taking; in either of which cases the degree of force is immaterial. Such taking constitutes robbery whenever it appears that, although the taking was fully completed without the knowledge of the person from whom taken, such knowledge was prevented by the use of force or fear.[50]

RCW 9A.56.210 provided that "[a] person is guilty of robbery in the second degree if he commits robbery."[51] RCW 9A.56.200 provided that "[a] person is guilty of robbery in the first degree if in the commission of a robbery or of immediate flight therefrom, he: (a) [i]s armed with a deadly weapon; or (b) [d]isplays what appears to be a firearm or other deadly weapon; or (c) [i]nflicts bodily injury."[52] For both degrees of robbery, Washington case law required that the defendant have an intent to steal.[53] First degree robbery is a class A felony, while second degree robbery is a class B felony.[54]

These provisions make it apparent that every *statutory* element of Arizona's class 4 Robbery is contained in Washington's second degree robbery. Russell contends, however, that the Washington crime includes the *nonstatutory* element of intent to deprive the victim, whereas the Arizona crime does not. We agree that the Washington crime includes that nonstatutory element,[55] but we disagree that the Arizona crime does not; the Arizona courts, like Washington's, require proof of intent to deprive the victim.[56] Russell's 1980 Arizona conviction for "Robbery, a Class 4

---

[50] LAWS OF 1975, 1st Ex. Sess., ch. 260, § 9A.56.190.

[51] LAWS OF 1975, 1st Ex. Sess., ch. 260, § 9A.56.210.

[52] LAWS OF 1975, 1st Ex. Sess., ch. 260, § 9A.56.200.

[53] *State v. Kjorsvik*, 117 Wn.2d 93, 98, 812 P.2d 86 (1991); *State v. Quillin*, 49 Wn. App. 155, 164-65, 741 P.2d 589 (1987), *review denied*, 109 Wn.2d 1027 (1988); *State v. Faucett*, 22 Wn. App. 869, 870-71, 593 P.2d 559 (1979); *see also, e.g., State v. Byers*, 136 Wash. 620, 622, 241 P. 9 (1925); *State v. Carter*, 4 Wn. App. 103, 109, 480 P.2d 794, *review denied*, 79 Wn.2d 1001 (1971); WAYNE R. LaFAVE & AUSTIN W. SCOTT, JR., HANDBOOK ON CRIMINAL LAW § 94, at 692 (1972).

[54] RCW 9A.56.200(2); RCW 9A.56.210(2).

[55] *Kjorsvik*, 117 Wn.2d at 98; *Quillin*, 49 Wn. App. at 164-65.

[56] *Lopez*, 762 P.2d at 550; *Yarbrough*, 638 P.2d at 739-40.

felony," is comparable to a 1980 Washington conviction for second degree robbery, a class B felony.

## 2

■ The next question is whether the 1980 Arizona robbery counts as a most serious offense under Washington law. It does, because its Washington counterpart is second degree robbery, and second degree robbery is a most serious offense.[57]

## 3

The last question on the 1980 Arizona robbery is whether it is presently includable in Russell's offender score. RCW 9.94A.360(2) states in part:

> Class B prior felony convictions other than sex offenses shall not be included in the offender score if, since the last date of release from confinement (including full-time residential treatment) pursuant to a felony conviction, if any, or entry of judgment and sentence, the offender had spent ten consecutive years in the community without committing any crime that subsequently results in a conviction.

The record as supplemented by order of this court shows that Russell was last released from felony confinement in 1990. Thus, Russell's 1980 Arizona robbery does not wash out and is presently includable in his offender score.

We summarize the 1980 robbery as follows: The Arizona court that adjudicated Russell's 1980 Arizona robbery case necessarily found each element needed to convict of Washington's second degree robbery. A 1980 conviction for Washington's second degree robbery would be a "strike" because second degree robbery is a most serious offense that would be presently includable in Russell's offender score. Russell's 1980 Arizona robbery conviction has those same sentencing consequences, so it is also a "strike."

---

[57] Former RCW 9.94A.030(23) (1996).

## C

We now apply our analysis to Russell's 1982 Arizona kidnap conviction. To do that, we ask two questions: (1) To what Washington offense is it comparable? (2) Is that Washington offense a most serious one? We need not go beyond the second question, because we answer it negatively.

## 1

In 1982, Arizona had three degrees of kidnapping, plus a crime called "unlawful imprisonment." ARIZ. REV. STAT. § 13-1304 provided:

**A.** A person commits kidnapping by knowingly restraining another person with the intent to:

1. Hold the victim for ransom, as a shield or hostage; or

2. Hold the victim for involuntary servitude; or

3. Inflict death, physical injury or a sexual offense on the victim, or to otherwise aid in the commission of a felony; or

4. Place the victim or a third person in reasonable apprehension of imminent physical injury to the victim or such third person;

5. Interfere with the performance of a governmental or political function;

6. Seize or exercise control over any airplane, train, bus, ship or other vehicle.

**B.** Kidnapping is a class 2 felony unless the victim is released voluntarily by the defendant without physical injury in a safe place prior to arrest and prior to accomplishing any of the enumerated offenses in subsection A of this section in which case it is a class 4 felony. If the victim is released pursuant to an agreement with the state and without any physical injury, it is a class 3 felony.[58]

ARIZ. REV. STAT. § 13-1303 provided:

---

[58] 1978 ARIZ. SESS. LAWS, ch. 201, § 132, effective Oct. 1, 1978.

**A.** A person commits unlawful imprisonment by knowingly restraining another person.

. . . .

**C.** Unlawful imprisonment is a class 6 felony unless the victim is released voluntarily by the defendant without physical injury in a safe place prior to arrest in which case it is a class 1 misdemeanor.

Ariz. Rev. Stat. § 13-1301(2) defined "restrain" as follows:

[T]o restrict a person's movements without consent, without legal authority, and in a manner which interferes substantially with such person's liberty, by either moving such person from one place to another or by confining such person. Restraint is without consent if it is accomplished by

(a) physical force, intimidation or deception[.]

In 1982, Washington had two degrees of kidnapping, plus a crime called "unlawful imprisonment." RCW 9A.40.020 provided:

(1) A person is guilty of kidnapping in the first degree if he intentionally abducts another person with intent:

(a) To hold him for ransom or reward, or as a shield or hostage; or

(b) To facilitate commission of any felony or flight thereafter; or

(c) To inflict bodily injury on him; or

(d) To inflict extreme mental distress on him or a third person; or

(e) To interfere with the performance of any governmental function.

(2) Kidnapping in the first degree is a class A felony.[59]

RCW 9A.40.030 provided:

(1) A person is guilty of kidnapping in the second degree if he intentionally abducts another person under circumstances not amounting to kidnapping in the first degree.

. . . .

---

[59] Laws of 1975, 1st Ex. Sess., ch. 260, § 9A.40.020.

(3) Kidnapping in the second degree is a class B felony.[60]

RCW 9A.40.040 provided:

(1) A person is guilty of unlawful imprisonment if he knowingly restrains another person.[61]

RCW 9A.40.010 defined "restrain" and "abduct" as follows:

(1) "Restrain" means to restrict a person's movements without consent and without legal authority in a manner which interferes substantially with his liberty. Restraint is "without consent" if it is accomplished by (a) physical force, intimidation, or deception[.]

(2) "Abduct" means to restrain a person by either (a) secreting or holding him in a place where he is not likely to be found, or (b) using or threatening to use deadly force[.][62]

Russell argues, for the first time on appeal, that abduction is an essential element under Washington's kidnap statutes, but is omitted from Arizona's kidnap statutes. If he is correct, the Arizona court may not have found an essential element of the Washington crime, and we cannot be sure that Russell would have been convicted here if prosecuted here in 1982.

 The State makes no effort to refute this argument on its merits. The State asserts, however, that Russell may not raise the argument for the first time on appeal.[63] We disagree. The general rule is that "issues not raised in the trial court may not be raised for the first time on appeal."[64] An exception is that "illegal or erroneous sentences may be

---

[60] LAWS OF 1975, 1st Ex. Sess., ch. 260, § 9A.40.030.

[61] LAWS OF 1975, 1st Ex. Sess., ch. 260, § 9A.40.040. In Washington, unlawful imprisonment is a lesser included offense within kidnapping. *State v. Hansen*, 46 Wn. App. 292, 296, 730 P.2d 706 (1986).

[62] LAWS OF 1975, 1st Ex. Sess., ch. 260 § 9A.40.010.

[63] The State also claims that the argument cannot be raised because Russell stipulated that the Arizona kidnapping conviction was a strike. As we read the record, however, Russell did not stipulate; he said only that he was "not challeng[ing] the kidnapping as a prior." 14 Report of Proceedings at 24. If Russell had stipulated, ineffective assistance would be a serious question. *Cf. State v. Saunders*, 91 Wn. App. 575, 578-79, 958 P.2d 364 (1998).

[64] *Ford*, 137 Wn.2d at 477.

challenged for the first time on appeal."[65] Russell is challenging an allegedly illegal or erroneous sentence, and he may do so for the first time on appeal.[66]

We briefly discuss the merits, even though the State does not contest them. In 1982, Arizona's crime of kidnap required knowing restraint plus one of a number of specific intents, some of which Washington does not recognize. Washington's crime of second degree kidnap required not just knowing "restraint," but an intentional "abduction." Arizona defined "restraint" as "restrict[ing] a person's movements without consent, without legal authority, and in a manner which interferes substantially with such person's liberty, by either moving such person from one place to another or by confining such person." Washington defined "restraint" as "restrict[ing] a person's movements without consent and without legal authority in a manner which interferes substantially with his liberty." Washington defined "abduction" as restraint "by either (a) secreting or holding [the victim] in a place where [the victim] is not likely to be found, or (b) using or threatening to use deadly force[.]"[67]

As a consequence of these provisions, an Arizona court adjudicating Russell's 1982 kidnapping case would have found that he knowingly restricted another person's movements without consent, without legal authority, and in a manner that interfered substantially with the other person's movements. It would not have found, as far as the present record shows, that he secreted or held the other person in a place where the other was not likely to be found, or that he used or threatened to use deadly force. Accordingly, it would not have found each essential element of Washington's crime of kidnap; we have no way of knowing

---

[65] *Ford*, 137 Wn.2d at 477.

[66] We note in passing that even if Russell could not raise his challenge now, he could do so at resentencing. He must be resentenced regardless of the challenge under discussion because, as we recognize in the unpublished portion of this opinion, he was not afforded his right of allocution at the initial sentencing.

[67] Br. of Appellant at 20 (quoting RCW 9A.40.010(2)).

whether Russell would have been convicted of kidnap in Washington;[68] and Russell's Arizona conviction has not been shown to be comparable to a Washington conviction for either first or second degree kidnap.

Although kidnapping under Arizona law has not been shown to be comparable to kidnapping under Washington law, kidnapping under Arizona law has been shown to be comparable to unlawful imprisonment under Washington law. Because each requires knowing restraint, a conviction for one shows that a conviction for the other would have been entered if prosecution had occurred in the other state.

### 2

■ The next question is whether the 1982 Arizona kidnap counts as a most serious offense under Washington law. It does not, according to the present record, because its Washington counterpart, unlawful imprisonment, is not a most serious offense.[69]

We summarize the 1982 kidnap as follows: The Arizona kidnap statutes did not require proof of abduction, but the Washington kidnap statutes did. As a result, the record does not show that Russell would have been guilty of kidnap in Washington, and his 1982 kidnap conviction does not carry the sentencing consequences of a Washington kidnap conviction. The 1982 conviction does carry the sentencing consequences of a Washington unlawful imprisonment conviction, but unlawful imprisonment is not a most serious offense, and only a most serious offense can be a "strike."[70] Based on the present record, Russell's 1982 kidnap conviction has not been shown to be a strike.

■ If the defense had objected to the Arizona kidnap at the time of the original sentencing, we would remand for

---

[68] *Berry*, 141 Wn.2d at 131 (quoting *Cameron*, 80 Wn. App. at 378); *Weiand*, 66 Wn. App. at 34.

[69] Former RCW 9.94A.030(23) (1996).

[70] Former RCW 9.94A.030(27)(a) (1996).

resentencing without reference to the persistent offender statutes.[71] Because the defense did not object, however, it may have deprived the State of a fair opportunity to present the record of the Arizona kidnap.[72] At resentencing then, the State should be given an opportunity to prove that Russell's 1982 kidnap conviction was truly comparable to a Washington kidnap conviction. To meet its burden of proving that,[73] however, the State must show that the 1982 Arizona kidnap court expressly or impliedly *found* each element essential to a Washington kidnap conviction; mere *evidence* of an element is not by itself enough, for without a finding based on such evidence, there is no way to know whether the evidence was reliable beyond a reasonable doubt. The trial court shall resentence Russell as a non-persistent offender unless the State bears its burden of proving a second strike.

The conviction is affirmed, the sentence is vacated, and the case is remanded for resentencing.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

HUNT, A.C.J., and BRIDGEWATER, J., concur.

---

[71] *Ford*, 137 Wn.2d at 485.

[72] *Ford*, 137 Wn.2d at 485. The State should also have an opportunity to prove a different strike, if it has evidence of such a strike.

[73] *See Ford*, 137 Wn.2d at 480 (State bears burden of showing "the existence and classification of out-of-state convictions").